681 F.2d 624
 INTERNATIONAL LADIES' GARMENT WORKERS' UNION, AFL-CIO;
Herman Delgado; Ramona Correa; Francis Labonte; and Maria
Miramontes, on behalf of themselves and all persons
similarly situated, Plaintiffs-Appellants,
v.
Joseph SURECK; William French Smith;* Leonel J.
Castillo; and The Immigration and Naturalization
Service, Defendants-Appellees.
The INTERNATIONAL LADIES' GARMENT WORKERS' UNION, AFL-CIO;
Herman Delgado; Ramona Correa; Francis Labonte and Maria
Miramontes, on behalf of themselves and all persons
similarly situated, Plaintiffs-Appellants,
v.
Joseph SURECK; Gil Clarin; James Robinson; William French
Smith; * Leonel J. Castillo; and The Immigration
and Naturalization Service, Defendants-Appellees.
 Nos. 80-5054, 80-5153, 80-5035 and 80-5152.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 9, 1981.
Decided July 15, 1982.
 
 Henry R. Fenton, Levy & Goldman, Los Angeles, Cal., Michael Kantor, Manatt, Phelps, Rothenberg & Tunney, Los Angeles, Cal., for plaintiffs-appellants.
 Lawrence B. Gotlieb, Molly Munger, Asst. U. S. Attys., Los Angeles, Cal., for defendants-appellees.
 On Appeal from the United States District Court for the Central District of California.
 Before ANDERSON and NORRIS, Circuit Judges, and MUECKE, District judge**.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 This case presents another challenge to the methods used by the Immigration and Naturalization Service (INS) in its efforts to vigorously enforce the nation's immigration laws. Appellant International Ladies' Garment Workers' Union (ILGWU) and the named appellants appeal from district court rulings dismissing the ILGWU as a representational plaintiff, denying class certification, and denying two motions for summary judgment while granting cross motions for summary judgment in favor of the appellees (all referred to as "INS"). We reverse the summary judgment granted to the INS on the challenge to the detention and questioning.
 
 I. FACTS
 
 2
 Two actions, eventually consolidated, were filed in the district court requesting declaratory and injunctive relief from the INS' pattern and practice of conducting factory surveys or sweeps through factories and workplaces for purposes of locating illegal aliens.[1] Appellants challenge the INS activity as violative of the Fourth and Fifth Amendments.
 
 
 3
 The record demonstrates that at the time this litigation was initiated, the INS concentrated its Area Control operations[2] at workplaces rather than in residential areas because of the agency's limited resources and its experience in successfully apprehending large numbers of illegal aliens employed in various factories, most notably in the garment industry. The record also indicates that the Los Angeles District Office of the INS was conducting approximately four factory surveys per week and, on occasion, more than 100 illegal aliens were apprehended in a single factory as a result of surveys performed at various establishments.
 
 
 4
 The record also describes the typical factory survey as one commenced when the INS receives information, sometimes from anonymous sources, that a particular workplace may be employing illegal aliens. In order to verify this information, INS agents place the suspected workplace under visual surveillance in an effort to determine from observations of the workforce entering and leaving the workplace whether the company does indeed employ illegal aliens. If their information is verified, the agents are instructed to request permission of the workplace owner or management for the INS to enter and question suspected illegal aliens with the ultimate objective of arresting those found to be in the country illegally and referring them to appropriate deportation proceedings. The INS reports that approximately 90% of the owners and managers consent to the surveys of their workforce; the INS obtains search warrants to enter premises without such consent.
 
 
 5
 The record is free of disputed issues of material fact, although varying characterizations of the events surrounding the typical factory survey appear. After receiving consent or pursuant to warrant, INS agents enter the workplace by stationing agents at exits and entrances in order to prevent persons from leaving the workplace.[3] The remaining agents proceed through the factory, questioning workers as to their citizenship status. While the officers and agents are instructed to be courteous and cause as little disruption as possible, the survey process often begins with workers' cries of "la migra" (the immigration), followed by attempts by some workers to hide or run from INS officers conducting the survey. Disruption of the workplace usually occurs. The officers are instructed to question each worker, although the INS admits that such a task is not often possible.[4]
 
 
 6
 Three particular surveys are challenged in this case. Search warrants were issued for two surveys conducted at the Southern California Davis Pleating Company (Davis) workplace, the first conducted on January 4, 1977, where 78 illegal aliens were apprehended, and the other conducted on September 27, 1977, where 39 illegal aliens were apprehended. The third challenged survey occurred at a firm known as Mr. Pleat on October 3, 1977, where the INS entered by consent of the owner and where 45 illegal aliens out of workforce of approximately 90 were arrested. Appellants Delgado and Correa, United States citizens, and appellant Labonte, a resident alien, were all subjected to INS questioning at the Davis plant during the September survey. Appellant Miramontes, a resident alien, was asked three questions during the October survey of Mr. Pleat.
 
 
 7
 The search warrants for the Davis surveys were issued under Fed.R.Crim.P. 41 and did not state with particularity the names of any individual illegal aliens sought as the objects of the searches.[5] The INS entered the Mr. Pleat facility with the consent of the owner of the facility and not the consent of all of the workers. The record also indicates that during the Davis surveys, the INS agents did not question every worker as policy would usually dictate because manpower limitations prevented such a procedure in a factory employing 200-300 workers as did Davis at the time of the surveys. Instead, the workers chosen for questioning at the Davis surveys were selected with the agents' use of a combination of objective and subjective factors.[6]
 
 
 8
 As the labor organization certified as the exclusive representative of production and maintenance employees at the Davis and Mr. Pleat facilities, the ILGWU asserts its representational capacity to sue on behalf of its members under the Labor-Management Relations Act of 1947, 29 U.S.C. §§ 141, et seq. The ILGWU alleges that it represents thousands of garment workers, the majority of whom are of Latin ancestry employed in shops throughout the Central Judicial District of California. It alleges injury to itself and its members as a result of the INS factory surveys. Acting upon a motion filed by the INS, the district court ordered the Union dismissed from the litigation by an order filed on November 16, 1979, and entered as a final judgment under Fed.R.Civ.P. 54(b) on December 13, 1979. The Union appeals from this dismissal in Nos. 80-5035 and 80-5054.
 
 
 9
 The appellants' motion to certify a class consisting of "all persons of Latin ancestry or of a Spanish surname who are, will be, or have been employed in the garment industry or in any other industry in the Central Judicial District of California" was denied by Order entered May 31, 1979. Appellants appeal from this order in Nos. 80-5152 and 80-5153.
 
 
 10
 In December of 1979, the parties filed cross-motions for partial summary judgment on the issues of the constitutional validity of the search warrants and the validity of the surveys conducted with consent of only the owner of the Mr. Pleat workplace. On these issues, the district court found for the INS, holding the warrants valid as issued under Fed.R.Cr.Pro. 41(b)(4), containing sufficient particularity as to the persons to be seized and based upon sufficient probable cause. As an alternative holding, the district court found that the appellants lacked a sufficient privacy interest in their workplace to contest the surveys pursuant either to warrant or consent.
 
 
 11
 In January of 1980, the parties filed cross-motions for summary judgment on the remaining issues involving the propriety of the INS detention and questioning of workers during the surveys. On these issues, the district court again found for the INS, holding that the appellants were not arrested, detained or seized in a manner implicating the Fourth Amendment, that the INS properly conducted the questioning pursuant to statutory authority contained in 8 U.S.C. § 1357(a)(1), and that even if appellants had experienced some form of seizure by the placement of the INS investigators at factory exits, that the degree of intrusion was so limited that no Fourth Amendment violation existed.
 
 
 12
 The American Jewish Committee and the Mexican American Legal Defense and Educational Fund were granted leave to file an amicus curiae brief. The amici concentrate on alleged Fifth Amendment equal protection violations stemming from the surveys. The record contains no reference to district court action on the Fifth Amendment issues raised.[7]
 
 II. STANDARD OF REVIEW
 
 13
 This case appeared before the district court on two sets of cross-motions for summary judgment. In granting the motions in favor of the INS, the district court also adopted, with some changes, the prepared findings of fact and conclusions of law as submitted to the court by the INS. The most significant of the findings and conclusions were the district court's determinations that the plaintiffs did not have a legitimate privacy interest in the factory premises in order to contest the issuance of the search warrants, that none of the named plaintiffs had been arrested, detained or seized, and that the placing of INS agents at the exits of the factory during the operation did not rise to a level implicating Fourth Amendment constraints upon INS conduct.
 
 
 14
 Our review of summary judgment findings is de novo. This court will affirm a grant of summary judgment only if it appears from the record, after viewing all evidence and factual inferences in the light most favorable to the appellant, that there are no genuine issues of material fact and that the appellee is entitled to prevail as a matter of law. Gaines v. Haughton, 645 F.2d 761, 769 (9th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982); Heiniger v. City of Phoenix, 625 F.2d 842, 843 (9th Cir. 1980). The appellants and appellees agree that none of the material facts are in dispute. The district court acknowledged this as well. Finding of Fact No. 5, filed February 15, 1980, and Finding of Fact IV, filed February 20, 1980. Additionally, we find no evidence in the record that the parties intended a trial on stipulated record which would suggest a clearly erroneous standard of review of the district court's findings. See Starsky v. Williams, 512 F.2d 109 (9th Cir. 1975). We will, therefore, consider this case to be governed by the standard of review of district court findings applicable to summary judgments, and will review the record with all reasonable evidentiary inferences granted in favor of the appellants.
 
 
 15
 III. INS ENTRY WITH SEARCH WARRANT AND CONSENT
 
 
 16
 The searches at the Davis plant were conducted after the INS had procured search warrants issued by federal magistrates. Appellants assert that the warrants were defective because they were not supported with sufficient probable cause, were lacking in particularity since neither warrant listed the names or identity of particular aliens sought, and that Fed.R.Crim.P. 41 does not authorize the issuance of the type of warrant employed by the INS. We need not reach any of these questions because we are persuaded that the conduct of the INS during the factory surveys violated the Fourth Amendment rights of the factory workers.[8]
 
 
 17
 IV. FOURTH AMENDMENT CONSIDERATIONS REGARDING DETENTIVE QUESTIONING
 
 
 18
 1. Execution of the Factory Surveys Constitutes a Seizure Cognizable under the Fourth Amendment.
 
 
 19
 We now turn to the issues raised by the appellants' challenges to the conduct of the INS upon entry into the factories. A critical threshold issue here concerns the applicability of the Fourth Amendment to the INS questioning of workers during the factory surveys. The Fourth Amendment applies to law enforcement activities involving seizures of the person, including brief detentions short of a traditional arrest. Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); Reid v. Georgia, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980); Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975); Terry v. Ohio, 392 U.S. 1, 16-19, 88 S.Ct. 1868, 1877-78, 20 L.Ed.2d 889 (1968).
 
 
 20
 The INS contends that the facts of this case do not present a detention or seizure which would implicate the objective standards required by the Fourth Amendment, relying primarily upon statements from Terry v. Ohio, supra; United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); Cuevas-Ortega v. INS, 588 F.2d 1274 (9th Cir. 1979); and Cordon de Ruano v. INS, 554 F.2d 944 (9th Cir. 1977). The INS argues that the test for a seizure is one requiring an analysis whether a reasonable, innocent person in the position of plaintiffs would feel free to leave. The INS answers that question, as applied to the facts of the present case, in the negative, contending that the four named plaintiffs circulated throughout the factories and could not reasonably feel detained by the appearance of INS investigators. The INS discounts the stationing of investigators at the exits of the factories by arguing that the plaintiffs complain only of a single encounter with INS investigators, who did not display a weapon or uniform, asking only one to three questions. These facts, the INS argues, constitute no Fourth Amendment seizure of the plaintiffs.
 
 
 21
 Appellants argue that the execution of the factory surveys involved a seizure in the nature of custodial detention requiring articulation of probable cause for the arrest of the workers, relying upon Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In the alternative, the appellants contend that the factory surveys at least rose to the level of a seizure short of a traditional arrest, citing to Brignoni-Ponce, supra, and Terry v. Ohio, supra. Appellants maintain that the surveys are conducted with an exercise of physical force and a show of authority restraining the liberty of the workers. They point to the procedure whereby the exits to the factories are sealed off, while workers are immediately made aware of this action. They contend that the entry of the large number of agents into the workplace wearing badges and the common observation of immediate arrests of some workers who are seen attempting to flee increases the coercive impact of the operation. Appellants conclude that the plaintiffs are all made aware that for the duration of the survey, they are effectively detained in the custody of the INS agents performing the factory survey.
 
 
 22
 Initially, we would have to disagree with the appellants that a custodial detention of the sort observed in Dunaway v. New York, supra, is presented by the INS factory survey procedure. Although the appellants and other workers are surrounded by investigators placed at exits, and most workers are subjected to at least a visual perusal by investigators, if not actual questioning, the detentive nature of the factory survey, while intrusive, does not rise to the intrusive level of the traditional arrest found in Dunaway. Dunaway was escorted to police headquarters in a police vehicle and placed in an interrogation room although the officers did not have probable cause for his arrest. The Court noted that even though Dunaway was not informed that he was under arrest at the time he was originally placed into the custody of the officers, the facts suggested that his detention rose to the level of a traditional arrest requiring the general standard of probable cause that Dunaway had committed the crime under investigation.
 
 
 23
 The facts of the present case do not suggest an arrest because the record indicates that none of the workers was handcuffed or placed into custody until the investigators had sufficient probable cause to suspect that those in custody were in this country without proper documentation. We therefore find Dunaway inapposite.
 
 
 24
 However, we must agree that the procedure used by the INS involves more than mere questioning or casual conversation as argued by the INS.[9] Our reading of the record in this case leads us to the conclusion that the execution of the factory surveys, while not rising to the level of an arrest requiring the general rule of probable cause, sufficiently intrudes upon the privacy and security interests of the workers that a seizure of the workforce occurs during the surveys.
 
 
 25
 This court's test to determine whether the factual circumstances of law enforcement activity rise to the level of a seizure under the Fourth Amendment is found in United States v. Anderson, 663 F.2d 934 (9th Cir. 1981):"(A) person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."
 
 
 26
 Id. at 939, (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, at 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)). Although this court in Anderson noted that the above-quoted test was stated only in the plurality opinion of Justice Stewart in Mendenhall (joined only by Rehnquist, J.), the court proceeded to apply the test to the facts of Anderson, holding that a seizure was present in that case. 663 F.2d at 939-40. We will apply the above-quoted test to the facts of this case to determine whether the events taking place during the factory surveys at the Davis and Mr. Pleat factories rose to the level of a Fourth Amendment seizure.
 
 
 27
 Before applying the test, however, we must recognize that a federal district court has concluded that the "INS's policy of stationing agents at all exits during area control operations, in order to secure the premises and prevent persons whom the agents have probable cause or reasonable suspicion to believe are aliens from leaving the premises during the operation ... results in 'seizures' for purposes of the fourth amendment." Illinois Migrant Council v. Pilliod, 531 F.Supp. 1011, 1018 (N.D.Ill.1982), granting summary judgment and permanent injunction as to this issue on remand from Illinois Migrant Council v. Pilliod, 398 F.Supp. 882 (N.D.Ill.1975), aff'd, 540 F.2d 1062 (7th Cir. 1976), modified as to remedy, 548 F.2d 715 (7th Cir. 1977) (en banc).[10] The instant case contains evidence of similar INS policy of stationing agents at the factory exits and entrances for similar purposes. While speaking in general terms about the area control operations performed in the Los Angeles area, the Assistant District Director for Investigations at the Los Angeles office of the INS stated that "(o)fficers are usually stationed at various entrances and exits in order to guarantee that individuals will not escape." Affidavit of Philip Smith, at 3, attached as Exhibit B to Defendants' Memorandum in Support of Defendants' Motion to Dismiss, C.R. 14.
 
 
 28
 In Pilliod, the district court concluded that the "record reveals that the agents do in fact surround and detain all persons on the premises during control operations." 531 F.Supp. at 1018. That court also noted:
 
 
 29
 "The entire purpose of the policy of 'securing the premises' is to ensure that the agents 'control' the aliens during the course of the 'control operation.' The agents stationed at the exits are specifically instructed to prevent from leaving those individuals they suspect are aliens. The record reveals that the agents do in fact surround and detain all persons on the premises during control operations."
 
 
 30
 Id. In response to INS arguments that the workers subjected to the area control operations voluntarily cooperated with the INS questioning and that the workers were never made aware of any limitation upon their movement by the presence of the agents stationed at the exits, the court in Pilliod remarked:
 
 
 31
 "Indeed, the entire notion of preventing people from leaving a given area, and 'securing' that area, requires that the agents rely on their authority, if not actual threats of force, to restrict freedom of movement and the 'freedom to walk away.'
 
 
 32
 ....
 
 
 33
 "(T)he entire notion of 'securing the premises' necessarily implies that those on the premises are made aware of the presence of INS agents.
 
 
 34
 ....
 
 
 35
 "Indeed when agents are stationed at points of egress, it is only reasonable to infer that they are there in order to restrict egress.... This limitation on the freedom to walk away means that a seizure has occurred for purposes of the fourth amendment."
 
 
 36
 531 F.Supp. at 1019 (citations omitted).
 
 
 37
 We think the reasoning of the Pilliod court is persuasive.[11] The facts suggesting a seizure of the workforce in this case mirror the facts involved in the factory surveys that were the subject of the injunction in Pilliod. From the record in this case, we additionally observe that it appears that the stationing of the agents at exits and entrances is an integral feature of the successfully executed factory survey. The surrounding and securing of exits, the obvious function of which is to produce a captive workforce, in combination with the element of surprise, directly leads to many of the desired apprehensions. The total number of apprehensions would doubtless be reduced if the INS did not surround the facility surveyed in order to apprehend those attempting to flee. This flight of workers at a factory survey is a common occurrence as observed by INS investigators, as well as the appellants. We find unpersuasive the INS argument here that detention does not result from the execution of factory surveys where the use of detentive techniques significantly contributes to the apprehensions sought.
 
 
 38
 Nevertheless, the INS relies upon United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), for the proposition that the detention, if any, that existed during the surveys did not rise to the level of a seizure contemplated by the Fourth Amendment. In Mendenhall, Justice Stewart, joined only by Justice Rehnquist, held that the stop and questioning by Drug Enforcement Agency (DEA) agents of Mendenhall in the public concourse of the Detroit Metropolitan Airport did not amount to a seizure of Mendenhall's person, implicating the Fourth Amendment. We fail to find Mendenhall dispositive of the seizure issue in this case.
 
 
 39
 First, as admitted by the INS in its brief, the conclusion that no seizure occurred in Mendenhall was shared only by two justices. Three other justices (Powell, Chief Justice Burger, and Blackmun) did not reach the seizure issue since it had not been raised in the courts below, but concurred in the result finding that the DEA agents had articulable and reasonable grounds for believing that Mendenhall was engaged in criminal activity. Although this court has adopted the test for seizure as enunciated in the Stewart opinion in Mendenhall, that test has never been adopted by a majority of the Supreme Court, nor has a majority of the latter court decided whether stopping and questioning of persons matching "drug courier profiles" in airport concourses amounts to a seizure protected by Fourth Amendment standards. See also Reid v. Georgia, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).
 
 
 40
 Second, even if the Court had decided that the minimal intrusions involved in Mendenhall and Reid v. Georgia did not constitute seizures, we would be compelled to view the detention and questioning of the workforces in the present case as far more intrusive. In Mendenhall, Justice Stewart concluded that Mendenhall "was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions." 446 U.S. at 555, 100 S.Ct. at 1878. The Court concluded:
 
 
 41
 "(N)othing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure."
 
 
 42
 446 U.S. at 555, 100 S.Ct. at 1878. When comparing Mendenhall to this case, we note that, in addition to being questioned as to their citizenship status, the workers at the factory in the present case were subjected to a procedure that included the intrusive aspects noted throughout this opinion; i.e., the threatening presence of a number of INS investigators, some stationed at exits, others carrying out the survey by proceeding methodically down the rows of workers. The detentive environment created in the surveyed factories in this case is quite different from the casual stopping and questioning involved in Mendenhall, Reid v. Georgia, and our recent decision in United States v. Beale, 674 F.2d 1327, 1329-30 op. at 1671, 1673-74 (9th Cir. 1982).
 
 
 43
 Nor do we find Cuevas-Ortega v. INS, 588 F.2d 1274 (9th Cir. 1979), and Cordon de Ruano v. INS, 554 F.2d 944 (9th Cir. 1977), helpful to the INS' position that no seizure occurred. Those two cases involved no Fourth Amendment violation when illegal aliens were voluntarily questioned in their homes. As is the case with Mendenhall and Reid v. Georgia, the level of detention and show of authority involved in Cuevas-Ortega and Cordon de Ruano simply do not match that involved in the present case.
 
 
 44
 The INS also cites to Yam Sang Kwai v. INS, 411 F.2d 683 (D.C.Cir.) cert. denied, 396 U.S. 877, 90 S.Ct. 148, 24 L.Ed.2d 135 (1969), for the proposition that seizures must be personal and not general, the implication being that the stationing of agents at the exits in the present case could only rise to a general detention or seizure not cognizable as a Fourth Amendment seizure of each worker. We disagree.
 
 
 45
 Yam Sang Kwai does not advance the INS' position. Yam Sang Kwai involved a petitioner's argument that he was arrested the moment agents surrounded the outside of the restaurant where he was employed. Yam Sang Kwai never saw any of these agents until he was personally confronted. The D. C. Circuit rejected such an ex parte arrest notion, observing that a seizure must contain some element by which the seized person is made aware that personal liberty has been restrained. 411 F.2d at 686. The petitioner in Yam Sang Kwai was not aware of the agents' actions outside the restaurant and was arrested only after being personally confronted by an investigator who subsequently discovered probable cause for Yam Sang Kwai's arrest. In the present case, by contrast, the appellants noticed the presence of the INS at the factories immediately as the survey began. The appellants indicated that they were aware that the agents stationed at the exits physically prevented many workers from leaving. In addition, the number of INS investigators, wearing badges and carrying handcuffs, gave the workers the impression that they were tacitly under the detentive powers of the INS for the duration of the survey. Whatever lack of awareness Yam Sang Kwai had is not present on the record before us. Viewing the record with all inferences drawn in favor of the appellants, as is our obligation under our standard of review, we must conclude that the workers at the plants surveyed in this case were aware immediately of the detentive nature of the survey prior to any personal confrontation or interrogation.
 
 
 46
 Directly addressing the test for Fourth Amendment seizure as stated in Anderson, supra, the record indicates that regardless of the fact that some of the four named appellants had varying degrees of freedom to circulate through or exit the factories, the number of INS investigators employed during the surveys and the method of survey execution represented a threatening presence of INS agents to the reasonable worker. The investigators' authority was announced verbally and the display of INS badges worn by the investigators served as a continual reminder of that authority. Agents stationed at exits indicated to the entire workforce that departures were not to be contemplated. Some agents carried handcuffs and used them to detain those apparently suspected of being in this country illegally. The operation unfolded with surprise and resulted in sustained disruption of the working environment. The element of surprise was used to prevent undetected departures, and the methodical execution of the operation with a line of agents proceeding down the rows of workers could reasonably be viewed as a threatening presence. Under these circumstances, we must conclude that even before individual questioning began, a reasonable worker "would have believed that he was not free to leave." Anderson, supra, 663 F.2d at 939. We therefore hold that the manner in which the factory surveys were conducted in this case constituted a seizure of the workforce implicating the Fourth Amendment.
 
 
 47
 2. The Fourth Amendment Prohibits Detentive Questioning of a Workforce Unless INS Investigators Can Articulate Objective Facts and Rational Inferences From Those Facts That Warrant a Reasonable Suspicion That Each Questioned Person is an Alien Illegally in this Country.
 
 
 48
 Having determined that a seizure of the workforce occurs during the factory surveys, our next task is to determine the constitutional standard applicable to the INS conduct.
 
 
 49
 The INS argues that even if a seizure implicating the Fourth Amendment is found, that the intrusion upon the privacy and security interests of the appellants was so slight as to constitute no Fourth Amendment violation, relying upon United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).[12]
 
 
 50
 The appellants, however, maintain that Dunaway, supra, requires the INS to question only those it may have probable cause to arrest during the factory surveys and, in the alternative, for the application of a standard comparable to that applied to automobile stops in Brignoni-Ponce. The appellants argue that an element of illegality and an element of individualized suspicion are required for sufficient protection of the Fourth Amendment rights of the workers. We agree with the appellants.
 
 
 51
 In other factual contexts, the Supreme Court has held that for an investigatory seizure or brief detention to be justified, law enforcement officials must be able to point to articulable and objective facts that the particular person being stopped or detained is suspected of criminal activity. United States v. Cortez, 449 U.S. at 417, 101 S.Ct. at 695, and cases cited therein. The above standard is an application of the "ultimate standard of reasonableness embodied in the Fourth Amendment," Michigan v. Summers, 452 U.S. at 699-700, 101 S.Ct. at 2592-93, and, with the exception of United States v. Martinez-Fuerte, requires law enforcement officials to have a reasonable, individualized suspicion that the particular person being detained is engaged in wrongdoing. United States v. Cortez.
 
 
 52
 This appeal presents two difficult issues regarding the constitutional standard applicable to INS citizenship status questioning during factory surveys. The first issue is created by an open question noted by the Supreme Court; i.e., whether citizenship status questioning is constitutionally valid when based upon a suspicion of alienage alone. The second issue is a question whether less than an individualized suspicion is sufficient for questioning workers present in a factory known to employ illegal aliens. We decide the first question by holding that a suspicion of alienage alone is insufficient. We answer the second by noting that case law in other contexts requires an individualized suspicion to justify investigatory seizures and detentions and should also be required in the context of the INS factory survey.
 
 
 53
 a. The Fourth Amendment Requires a Reasonable Suspicion That Those Detained and Questioned are in this Country Illegally.
 
 
 54
 In United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Supreme Court announced the Fourth Amendment standard applicable to non-border vehicular stops:
 
 
 55
 "Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country."
 
 
 56
 422 U.S. at 884, 95 S.Ct. at 2582 (emphasis added).
 
 
 57
 As for non-vehicular stops and questioning, the Court noted:
 
 
 58
 "(W)e reserve the question whether Border Patrol officers also may stop persons reasonably believed to be aliens when there is no reason to believe they are illegally in the country. See Cheung Tin Wong v. INS, 152 U.S.App.D.C. 66, 468 F.2d 1123 (1972); Au Yi Lau v. INS, 144 U.S.App.D.C. 147, 445 F.2d 217, cert. denied, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971). The facts of this case do not require a decision on the point."
 
 
 59
 422 U.S. at 884 n.9, 95 S.Ct. at 2582 n.9. The stopping[13] and questioning of persons as opposed to the stopping of vehicles is, of course, the question directly presented in the instant case.
 
 
 60
 Since Brignoni-Ponce, various courts of appeal have struggled with the answer to the question reserved in footnote 9 quoted above. The D. C. Circuit cases cited by the Court in footnote 9 of Brignoni-Ponce have established the benchmark standards from which the rules in other circuits seem to have evolved. The D. C. Circuit has consistently adhered to the rule that an INS agent, pursuant to statutory authority under section 287(a)(1) of the Immigration and Nationality Act (Act), 8 U.S.C. § 1357(a)(1),[14] may question a person as to his right to be or remain in the United States without forcible detention as long as the agent has a reasonable belief that the questioned person is an alien; Yam Sang Kwai v. INS, supra, and Blackie's House of Beef v. Castillo, 659 F.2d 1211, 1226 (D.C.Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982); but agents may forcibly detain a person temporarily for questioning "under circumstances creating a reasonable suspicion, not arising to the level of probable cause to arrest, that the individual so detained is illegally in this country." Au Yi Lau v. INS, 445 F.2d 217, 223 (D.C.Cir.1971), cert. denied, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971). See also, Ojeda-Vinales v. INS, 523 F.2d 286 (2d Cir. 1975). This dual standard thus imposes both a constitutional limitation and a statutory limitation upon the conduct of INS agents. If the nature of the agent's conduct employed during the questioning of a suspected alien amounts to a seizure implicating the Fourth Amendment, an INS agent must articulate a reasonable suspicion that the questioned person is an alien illegally in this country. If no seizure is employed, the agent need not articulate reasons to suspect the illegal presence of the person questioned, only a reasonable belief in the questioned person's alienage, the authority granted the INS agent by section 1357(a)(1). Until recently, both standards have been interpreted to require a particularized or individualized suspicion or belief regarding each questioned person in order to justify the intrusion resulting from the questioning.[15]
 
 
 61
 The Au Yi Lau and Yam Sang Kwai shifting standards based upon the degree of detention involved during INS citizenship status questioning appear to be the standards presently employed in the Seventh Circuit, Illinois Migrant Council v. Pilliod, 548 F.2d 715 (7th Cir. 1977) (en banc). However, such shifting standards, when applied to street encounters, were rejected forcefully in Marquez v. Kiley, 436 F.Supp. 100, 113-114 (S.D.N.Y., 1977).[16] The dual standard was also modified in Lee v. INS, 590 F.2d 497 (3d Cir. 1979), where the Third Circuit criticized the fine line drawing required to distinguish detentive from nondetentive questioning, and adopted a standard which combines the detention inquiry with the justification inquiry. The standard currently employed in the Third Circuit asks whether the INS stopping and questioning was reasonably related in scope to the justification for its initiation. Id. at 502; see also Babula v. INS, 665 F.2d 293, 295 (3d Cir. 1981) (applying the Lee standard, but allowing less than an individualized suspicion to be sufficient for citizenship status questioning).[17]
 
 
 62
 The Ninth Circuit standard is more in doubt. In Cordon de Ruano v. INS, 554 F.2d 944 (9th Cir. 1977), this court rejected an alien's argument that her Guatemalen passport, voluntarily given to INS agents during non-detentive questioning of her, should have been suppressed at her deportation hearing. This court noted that the passport was not illegally seized because the petitioner, Cordon de Ruano, was not "stopped" or "detained," and quoted dicta from United States v. Brignoni-Ponce, supra, as the established rule that "the INS may not stop or detain persons to question them about their citizenship 'on less than a reasonable suspicion that they may be aliens.' " 554 F.2d at 946, quoting Brignoni-Ponce, 422 U.S. at 884, 95 S.Ct. at 2582, 45 L.Ed.2d at 618. Conspicuously absent from the quoted rule is any requirement that the INS agents suspect that the questioned person is in this country illegally. That the quoted rule is dicta is made apparent by footnote 9 in Brignoni-Ponce, where the Court reserved the question "whether Border Patrol officers also may stop persons reasonably believed to be aliens when there is no reason to believe they are illegally in the country." Id. Since Cordon de Ruano did not require an elicitation of the suspicion standard for stopping and questioning persons since the court found no stop or detention, the case should be read only in aid of determining when a stop and/or detention has occurred which would invoke the appropriate constitutional standard.
 
 
 63
 A year after the decision in Cordon de Ruano, this court found evidence sufficient for the creation of "founded suspicion to detain" suspected aliens under section 1357(a), citing the D. C. Circuit cases of Au Yi Lau, supra, and Yam Sang Kwai, supra. Cabral-Avila v. INS, 589 F.2d 957, 959 (9th Cir. 1978), cert. denied, 440 U.S. 920, 99 S.Ct. 1245, 59 L.Ed.2d 472 (1979). The court in Cabral-Avila, assuming, without deciding, that probable cause was necessary prior to arrest of the petitioners in that case, held that the "founded suspicion that these persons were illegal aliens ripened into probable cause ...." Id. at 959 (emphasis supplied). Cabral-Avila can be read consistently with Au Yi Lau to require a suspicion of illegal alienage before detention is permitted.
 
 
 64
 Following Cabral-Avila, this court was again called upon to decide whether the non-detentive questioning of an illegal alien at the threshold of her apartment, where she freely admitted her illegal alienage, was violative of the Fourth Amendment. Cuevas-Ortega v. INS, 588 F.2d 1274 (9th Cir. 1979). As in Cordon de Ruano, the court found no seizure or detention implicating the Fourth Amendment. In a footnote, the Cuevas-Ortega court explained that in a situation in which a seizure is involved, "a non-border stop or detention to question a suspected illegal alien about his citizenship requires "reasonable suspicion." Id., 588 F.2d at 1277. The latter expression of the standard required for stopping and questioning can also be construed to require a reasonable suspicion of illegal alienage because of the immediate reference to Brignoni-Ponce in the footnote and because the language expressing the standard mentions illegal alienage.
 
 
 65
 More recently, this court affirmed a district court order suppressing a document which was the basis for an indictment under 18 U.S.C. § 1426(b) for use of forged immigration documents, because the document was elicited from the defendant under circumstances in which the INS agents failed to articulate "sufficient independent grounds to suspect (the defendant) of being an illegal alien." United States v. Heredia-Castillo, 616 F.2d 1147-49 (9th Cir. 1980) (Merrill, J., dissenting) (emphasis supplied). The court concluded that the agents had sufficient justification for stopping the vehicle under Brignoni-Ponce, but the majority decided that after the agents had discovered the driver of the vehicle to possess proper papers, the agents had insufficient justification for questioning the passenger, Heredia-Castillo. After discounting most of the government's proffered justifications for questioning Heredia-Castillo, the court noted that only two factors were supported by the record: that Heredia-Castillo was found in an area in which illegal aliens were frequently found, and that he appeared to be of Mexican ancestry. Those two observations were insufficient to justify the questioning of Heredia-Castillo. Discussing the latter factor, this court noted:
 
 
 66
 "The government has enumerated several facts which might cast a certain suspicion on every person in the area who appeared to be of Mexican ancestry. Under the record before us, such a generalized suspicion is not sufficient for us to overturn the trial court's ruling."
 
 
 67
 616 F.2d at 1150.
 
 
 68
 Heredia-Castillo is significant for a number of reasons. First, since the court held that the vehicle was properly stopped based upon the agents' reasonable suspicion that the driver might be an illegal alien (emphasizing the factor that one of the agents recognized the driver as a man he had previously been arrested for being illegally in the country), the court was not willing to transfer this justification for the additional detention and questioning of the vehicle's passenger when the driver was found to be in the country legally. For this, the court required sufficient independent grounds to suspect Heredia-Castillo of being an illegal alien-an individualized suspicion. Since Heredia-Castillo was already physically stopped when the INS agents focused their questions upon him, the court then applied the standard of founded suspicion to suspect illegal alienage to justify continued detention and questioning. For this, the agents were not allowed to focus merely upon Heredia-Castillo's apparent Mexican ancestry and the fact that he was present in an area known to contain illegal aliens-such a generalized suspicion is insufficient for further detention and questioning.
 
 
 69
 Finally, this court interpreted section 1357(a)(1) in Tejeda-Mata v. INS, 626 F.2d 721 (9th Cir. 1980), in a way that suggests that section 1357(a)(1) must be interpreted consistently with the Fourth Amendment if a seizure is involved. The court in Tejeda-Mata recited the language of section 1357(a)(1) and cites to Ojeda-Vinales, supra, Cheung Tin Wong, supra, and Au Yi Lau, supra. As discussed above, those cases all require an agent to articulate a reasonable suspicion of illegal alienage before detentive questioning can occur. In Tejeda-Mata, the court refused to suppress the alien's admission of alienage, noting that the petitioner was not arrested or threatened with curtailment of his liberty, citing Cordon de Ruano, supra.[18]
 
 
 70
 Our reading of the case law in this circuit regarding detentive questioning by the INS as discussed immediately above requires us to hold that INS investigators may not seize or detain workers for citizenship status questioning unless the investigators are able to articulate objective facts providing investigators with a reasonable suspicion that each questioned person, so detained, is an alien illegally in this country.
 
 
 71
 The element of illegality contained in the standard has been suggested by recent Court pronouncements of Fourth Amendment standards applicable to brief detentions short of formal arrests. In Michigan v. Summers, the Court discussed its precedent permitting minimal intrusions and stated:
 
 
 72
 "These cases recognize that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity."
 
 
 73
 452 U.S. at 699, 101 S.Ct. at 2592 (emphasis added). In United States v. Cortez, supra, the Court stated that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." 449 U.S. at 417-18, 101 S.Ct. at 694-95.[19]
 
 
 74
 The element of illegality contained in the standard is also required in order to minimize the effects of enforcement procedures felt by innocent workers. Our focus is not limited to a discussion of the rights of aliens. As the Court noted in Brignoni-Ponce :
 
 
 75
 "Although we may assume for purposes of this case that the broad congressional power over immigration, ... authorizes Congress to admit aliens on condition that they will submit to reasonable questioning about their right to be and remain in this country, this power cannot diminish the Fourth Amendment rights of citizens who may be mistaken for aliens."
 
 
 76
 422 U.S. at 883-84 (citations omitted). The status of alienage does not imply that any particular alien is in this country illegally. An alien, as either an immigrant or non-immigrant, may be in this country in total compliance with the immigration laws. Reliance upon section 1357(a)(1) therefore is insufficient. Although the statute is silent as to any requirement of suspicion of illegal presence, to assert that section 1357(a)(1) justifies the detentive questioning of an entire workforce simply ignores the truism that innocent citizens and aliens legally employed at surveyed factories enjoy the same right to be free of the indignity of arbitrary government intrusions which the Fourth Amendment guarantees all individuals. See, e.g., Delaware v. Prouse, 440 U.S. 648, 653-54, 99 S.Ct. 1391, 1395-96, 59 L.Ed.2d 660 (1979).
 
 
 77
 We realize that our holding here limits section 1357(a)(1) questioning in the context of factory surveys of the nature presented by the facts of this case. But this is not the first time the statute has been so limited. The Court has held that section 1357(a)(1) cannot justify a constitutional violation, Brignoni-Ponce, supra ; and we are mindful of the Court's more general admonition that "no Act of Congress can authorize a violation of the Constitution." Almeida-Sanchez v. United States, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). In view of the above, and the particular facts involved in this case, we think that a standard allowing detentive questioning on a suspicion of alienage alone would diminish the privacy and security interests of both citizens and aliens legally in this country. Random detentive questioning of all who may appear to be aliens without objective facts giving rise to a suspicion of illegal alienage would grant the INS impermissible discretion to detain and question at whim. See Delaware v. Prouse, supra.
 
 
 78
 b. The Fourth Amendment Requires an Individualized Suspicion of Illegal Alienage of Those Subject to Detentive Questioning.
 
 
 79
 As with the illegality requirement of the standard, detentive questioning, if not based upon an individualized, articulable suspicion, would be impermissibly random. Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); Heredia-Castillo, supra.
 
 
 80
 The INS contends that individualized suspicion is not required. The INS relies upon United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), arguing that even if a seizure were present during the factory surveys, that it was minimal; and, consequently, the government's interest in apprehending illegal aliens outweighs any interest of the questioned workers to be free from this minimal intrusion. In Martinez-Fuerte, the Supreme Court sanctioned the practice of the Border Patrol at permanent checkpoints to refer some vehicles to a secondary inspection area for additional questioning of citizenship status of the passengers of the vehicle on less than a particularized or individualized suspicion as to each person subjected to the referral, noting that "the Fourth Amendment imposes no irreducible requirement of (individualized) suspicion." Id., 428 U.S. at 543, 96 S.Ct. at 3074. The requirement of individualized suspicion was not imposed in Martinez-Fuerte because the resulting intrusion of the permanent checkpoint stops on the interests of the motorists was minimal and outweighed by the substantial law enforcement interests involved. The INS argues that the intrusion, if any, in the instant case, is less than that permitted in Martinez-Fuerte, and that the same governmental interest in enforcement of the immigration laws makes it permissible for the INS to question factory workers on less than an individualized suspicion.
 
 
 81
 The appellants, on the other hand, find Martinez-Fuerte inapplicable. The appellants emphasize the Court's limited holding in Martinez-Fuerte to permanent checkpoints because motorists at these checkpoints are not taken by surprise and that the routine operation of the checkpoints involves little discretionary law enforcement. 428 U.S. at 559, 96 S.Ct. at 3083. The appellants argue that the facts of the instant case are more like a roving border patrol stop than a permanent checkpoint, contending that the individualized suspicion standard imposed in Brignoni-Ponce should apply here. We must agree with appellants.
 
 
 82
 Although we recognize the weighty law enforcement interests involved,[20] the language in Martinez-Fuerte is more supportive of the appellants' position than that of the INS. In discussing the differences between a permanent checkpoint stop and a roving patrol stop in Martinez-Fuerte, the Court noted that while the objective intrusion (the stop itself, the questioning and visual inspection) was similar in both cases, the subjective intrusion (concern or fright on the part of lawful travelers) in a roving stop was much greater. The Court noted that when compared with a roving patrol stop, the permanent checkpoint stop was much less intrusive because motorists were not taken by surprise and that checkpoint operations "both appear to and actually involve less discretionary enforcement activity." 428 U.S. at 559, 96 S.Ct. at 3083. Commenting on the procedure of selective referral at the checkpoints, the Court stated:
 
 
 83
 "Selective referral may involve some annoyance, but it remains true that the stops should not be frightening or offensive because of their public and relatively routine nature."
 
 
 84
 428 U.S. at 560, 96 S.Ct. at 3084. In comparison to that statement, the record in the instant case contains evidence that the factory surveys were quite frightening to the workers, leaving many in a state of anxiety over perceived recurrence of the surveys and subsequent arrests. Instead of the three or four minute routine detention of lawful motorists at the permanent checkpoint in Martinez-Fuerte, the record in this case indicates a relatively greater degree of disruption from the surprise entry of the workplace for the typical hour and one-half of questioning and for some time thereafter. Moreover, the actual implementation of the factory surveys in the instant case suggests more random enforcement, giving agents greater discretion than is involved in the checkpoint operation. By securing exits and systematically proceeding in a line down rows of workers, the INS factory survey compares more to an unannounced automobile checkpoint located and operated by surprise wherein all motorists are detained for an hour and one-half, while the agents systematically scrutinize all detained motorists and passengers, choosing those the agents wish to question. The factors involved in a permanent checkpoint on highways that balance against impermissible discretionary law enforcement, i.e., no surprise, short duration, minimal disruption, are simply not present in the instant case. The factory survey in which an entire workforce is detained and subjected to INS scrutiny, a survey requiring the element of surprise in order to be successful, is an operation presenting serious dangers to the Fourth Amendment rights of citizens and legal alien workers. Such a survey cannot be considered to be as minimally intrusive as a permanent checkpoint stop. We therefore reject the notion that Martinez-Fuerte allows factory survey questioning of individual workers on less than a particularized or individualized suspicion of each worker questioned.
 
 
 85
 By rejecting the Martinez-Fuerte analogy, we necessarily reject Babula v. INS, 665 F.2d 293 (3d Cir. 1981), to the extent that case stands for the proposition that factory survey questioning is constitutionally permissible on less than a particularized suspicion. In Babula, the INS had received information from a reliable source that H & H Industries at Pennsauken, New Jersey, had employed illegal aliens. The information listed seven named Polish aliens and the source informed the INS that the company had employed additional unnamed illegal aliens. INS records suggested that six of the seven named persons were not subject to deportation. After deciding that the H & H Factory would be a feasible location for an "area control operation," the INS agents carried it out by using six agents, three posted at the exits of the factory "to prevent anyone from leaving the factory," and three entered the factory. Upon entry, the agents spoke with the general manager and the night foreman, inquiring about the seventh named, suspected illegal alien, and were informed that this person no longer worked at the factory. Thus, with no information as to any particular named persons who were suspected of being in the country illegally, the agents began questioning workers in the factory as to their citizenship status and whether they had the proper papers. Ten workers were arrested. All petitioners in the Babula case were found deportable by an immigration judge, the deportation orders subsequently being affirmed by the Board of Immigration Appeals.
 
 
 86
 One of the issues raised by the petitioners in Babula was whether the agents had violated their Fourth Amendment rights by questioning them at the factory pursuant to 8 U.S.C. § 1357(a)(1). The Third Circuit had held previously that section 1357 was limited by the restrictions of the Fourth Amendment. Lee v. INS, 590 F.2d 497, 499-500 (3d Cir. 1979). Reaching the merits of the Fourth Amendment contention, the Third Circuit in Babula noted:
 
 
 87
 "(I)n this case the agents had observed nothing specifically about each person questioned, but rather based their suspicions on the milieu in which the workers were found. We hold that the tip from a reliable source about the employment of illegal Polish aliens, combined with the indicia that H & H did employ Polish aliens, are sufficient to justify the minimally intrusive questioning that the agents conducted."
 
 
 88
 665 F.2d at 296. The court proceeded to justify its "milieu" standard by indicating that "individualized suspicion is not required ... when 'we deal neither with searches nor with the sanctity of private dwellings.' " Id. The court also emphasized that the INS agents were not allowed unfettered discretion because "all the employees rather than a selection of them" were questioned at H & H. Id. at 296-97.
 
 
 89
 We have serious problems with the Babula reasoning and find it inapposite to the facts of this case. The questioning of workers at the H & H facility on less than an individualized suspicion that each questioned worker was an illegal alien appears to be a departure from the suspicion required in the Third Circuit's own case of Lee v. INS, supra. Even though Lee rejected the dual, constitutional/statutory standard based upon the degree of detention involved that is the standard suggested in Pilliod, Au Yi Lau and Yam Sang Kwai, the facts of Lee required the Third Circuit to determine that the INS agent had sufficient articulable facts concerning Lee individually that the scope of the detention in that case was reasonably related to the justification for its initiation. See dissenting opinion of Adams, J.; 665 F.2d at 300. Babula now extends the rule to situations in which the INS can prove the reasonableness of the questioning based upon information that the factory has employed illegal aliens in the past. For this holding, the Third Circuit notes that although " 'some quantum of individualized suspicion is usually a prerequisite to a constitutional search and seizure, (there is) no irreducible requirement of such suspicion....' " Babula, 665 F.2d at 296 (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 560-561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976)).
 
 
 90
 In addition, the Third Circuit noted that the INS questioned all of the workers at H & H, which the court apparently felt justified the questioning since the questioning of all workers does not involve the INS in the kind of discretionary law enforcement activity that was struck down in Delaware v. Prouse, supra.[21] It is therefore unclear what the Third Circuit would do were it presented with a case, such as the one presented to us here, where less than all workers were questioned.[22]
 
 
 91
 Finally, the Babula court attempted to harmonize its holdings with that of the Seventh Circuit in Illinois Migrant Council v. Pilliod, supra. The Babula court stated that the holding in Babula did not imply any disagreement with Pilliod because Pilliod involved late night, warrantless searches of living quarters. 665 F.2d at 297. This attempted harmonization is difficult to comprehend. First, the preliminary injunction in Pilliod was directed at factory area control operations, as well as searches of dwellings, dormitories and street encounters. See Illinois Migrant Council v. Pilliod, 398 F.Supp. 882, 886-891 (N.D.Ill.1975). Second, the factual discussion in Babula does not express the degree of detention, if any, that the workers at H & H suffered while being questioned during the area control operation there. All we know is that "three agents remained at the exits to the factory to prevent anyone from leaving the factory." 665 F.2d at 294. If Babula and Pilliod can be harmonized, it could only be from inferring that the Babula court felt that the degree of detention of the workers at H & H was of the non-detentive nature. This still does not entirely agree with the relief granted in Pilliod, for even if non-detentive questioning were involved at H & H, our reading of Pilliod would still require the INS agents to have a reasonable belief that the particular persons questioned without detention were aliens. On that note, the Third Circuit merely indicates that the agents "had observed nothing specifically about each person questioned, but rather based their suspicions on the milieu in which the workers were found." 665 F.2d at 296. This "milieu" standard is simply inconsistent with the standard adopted by the Seventh Circuit in Pilliod, and, in our minds, inconsistent with that required by the Fourth Amendment.
 
 
 92
 Thus, Babula provides this court with little assistance in deciding the issues before us. The Babula court relied heavily upon Martinez-Fuerte, a case we find inapplicable to the factory surveys that are the basis of the litigation presented in this case. Also, the Babula court noted that the methodical questioning of all of the workers at the H & H facility minimized the random discretion criticized in Delaware v. Prouse, supra. The INS admits that each worker was not questioned at the Davis survey in this case; therefore, any justification, if such exists, from the fact that all workers were questioned in Babula, does not transfer to this case.
 
 
 93
 In sum, the intrusive nature of the factory surveys in the present case is comparable to that found in a roving patrol stop discussed in Brignoni-Ponce. Martinez-Fuerte, and Babula, therefore, cannot be accepted as models for an announcement that the factory surveys are not violative of the Fourth Amendment. The detention and questioning of the workers in the surveyed factories must be based upon a reasonable suspicion that each worker subjected to detentive questioning is an alien illegally in this country, and the Fourth Amendment rights of all workers depend upon a standard requiring the INS to articulate an individualized suspicion that a questioned person is in this country illegally.
 
 
 94
 3. The Record fails to Substantiate the INS Claim That the Fourth Amendment Standard Was Met During the Factory Surveys.
 
 
 95
 Finally, we must apply the constitutional standard to the facts of this case. The INS argues that there was a sufficient basis for the questioning that occurred at the two factories. Relying on United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), where the Court defined reasonable suspicion to include an assessment of the totality of the circumstances surrounding a seizure in light of a law enforcement officer's experience, the INS points to a number of circumstances attending the factory surveys that justify the type of questioning that occurred. The INS directs our attention to the fact that the two factories surveyed were garment factories, an industry the INS alleges is known to employ large numbers of illegal aliens; that prior to the Davis surveys, INS investigators had arrested several illegal alien employees outside the factory premises who stated that other illegal aliens were employed in the factory; that upon entry of the INS investigators into the plants, the employees shouted "La Migra" and a large number of employees began running around the factory or hiding; and that by the time of the second Davis survey, the INS investigators knew that they had previously apprehended 78 illegal aliens from the first survey. In addition, the INS once again asserts that it could justifiably question appellants Labonte and Miramontes, resident aliens, under 8 U.S.C. § 1357(a)(1).
 
 
 96
 None of the above factors alone, or in combination, can justify the detentive questioning in this case because we have held that the factory surveys conducted at the Davis and Mr. Pleat facilities involved a seizure or detention of the entire workforce by the nature in which the surveys were carried out.[23] Since the entire workforce is effectively detained in a manner implicating the Fourth Amendment standard discussed above, the circumstances the INS cites to justify the questioning simply do not aid our analysis of whether the INS had a reasonable, individualized suspicion of illegal alienage of each detained worker prior to the execution of the surveys. Moreover, we think the warrantless detention of the workforces in this case cannot possibly be justified under the standard we find applicable today.
 
 
 97
 We feel the Fourth Amendment rights of workers would be impermissibly diminished were we to sanction the unconstrained use of warrantless, detentive questioning of the sort depicted by this record-questioning which is frightening to the workers, intrusive, and often "based on nothing more than inarticulate hunches." Terry v. Ohio, 392 U.S. at 22, 88 S.Ct. at 1880. The suggestions in the INS "M-69" handbook that a reasonable suspicion of illegal alienage may be based on an officer's knowledge of a high concentration of illegal aliens in the area surveyed, without more, is insufficient. Heredia-Castillo, supra. The apparent Hispanic ancestry of one sought for questioning, while possibly relevant, see United States v. Brignoni-Ponce, 422 U.S. at 886-87, 95 S.Ct. at 2582-83, is insufficient, even if noticed in conjunction with the knowledge of the presence of a person in an area known to contain a high concentration of illegal aliens. Heredia-Castillo, supra. That a factory happens to be a garment factory, without more, is insufficient grounds for the effective detention of the entire workforce in such a factory. Whether "excessive nervousness" or "studied nonchalance," of a suspected illegal alien observed prior to detentive questioning, would be sufficient to meet the standard announced in this opinion is basically a factual question to be resolved on a case-by-case basis. The INS makes no claim here that such observations were made of the entire workforces at the surveyed factories.
 
 
 98
 Certainly, United States v. Cortez, supra, instructs courts to grant some deference to the field officer's experience and his or her view of the totality of the circumstances attending any particular detention or apprehension. However, Cortez cannot be read to justify the detention of a workforce and questioning of workers on subjective or generalized suspicions that some unidentified workers in a factory may be found to be in this country without proper documentation. The Court in Cortez held:
 
 
 99
 "Based upon (the) whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."
 
 
 100
 449 U.S. at 417-18, 101 S.Ct. at 694-95 (emphasis added). The suspicious facts offered by the INS which provide a general focus upon the factories surveyed, while possibly true, do not provide sufficient justification for the execution of the surveys in a manner which effectively detains an entire workforce. The factors listed by the INS fail to provide a particularized and objective basis prior to the execution of the surveys for suspecting any of the questioned workers of being aliens illegally in this country.
 
 
 101
 We recognize that our decision today may hinder INS efforts to seek out illegal aliens in workplaces. Acknowledging that fact, we think it also appropriate to acknowledge that this case effectively illustrates the irony noted by Justice White when he commented some years ago on the INS' struggle to contain the heavy flow of illegal aliens into this country:
 
 
 102
 "The entire system, however, has been notably unsuccessful in deterring or stemming this heavy flow; and its costs, including added burdens on the courts, have been substantial. Perhaps the Judiciary should not strain to accommodate the requirements of the Fourth Amendment to the needs of a system which at best can demonstrate only minimal effectiveness as long as it is lawful for business firms and others to employ aliens who are illegally in the country."
 
 
 103
 Concurring opinion of Justice White, joined by Justice Blackmun in United States v. Brignoni-Ponce, supra, 422 U.S. at 914-15, 95 S.Ct. at 2597, and in United States v. Ortiz, 422 U.S. 891, 914-15, 95 S.Ct. 2585, 2597, 45 L.Ed.2d 623 (1975) (emphasis added). To find the factory survey procedures evidenced by the record before us constitutional would be, as suggested by Justice White, straining the Fourth Amendment requirements in order to accommodate an intrusive and objectionable method of immigration law enforcement. The Constitution, as we interpret it, cannot be so accommodating. We therefore reverse the district court's summary judgment in favor of the INS on the issue of worker questioning.[24]
 
 V. CONCLUSION
 
 104
 The summary judgment granted in favor of the INS on the issue of worker questioning is reversed. This case is remanded to the district court for further proceedings not inconsistent with this opinion.
 
 
 105
 REVERSED and REMANDED.
 
 
 
 *
 Pursuant to Rule 43(c)(1) of the Federal Rules of Appellate Procedure, William French Smith has been substituted for Benjamin R. Civiletti as the defendant
 
 
 **
 The Honorable C. A. Muecke, Chief Judge, United States District Court for the District of Arizona, sitting by designation
 
 
 [1]
 Throughout this opinion, the term "illegal alien" refers to aliens who have entered this country and/or are found to be in this country in violation of the laws of the United States. In this category are aliens who enter without inspection, aliens who overstay their non-immigrant visas and passes, and any others who enter or remain in the United States in violation of immigration and other laws. For most purposes, the term is synonymous with deportable alien. See United States v. Martinez-Fuerte, 428 U.S. 543, 553, 96 S.Ct. 3074, 3080, 49 L.Ed.2d 1116 (1976)
 
 
 [2]
 Record references to Area Control define it as operations which are designed to locate and apprehend aliens illegally in the United States. Declaration of Phillip Smith, Assistant Director for Investigations, Los Angeles District Office of the Immigration and Naturalization Service; Exhibit A, C.R. 97. Factory surveys apparently are considered to be a category of Area Control
 
 
 [3]
 Affidavit of Phillip Smith; C.R. 14 at 3
 
 
 [4]
 Id., at 4
 
 
 [5]
 The search warrants issued for the January and September 1977 surveys of the Davis facility do not state that particular named persons were the objects of the surveys, but merely state that the INS investigator who executed the affidavit in support of the warrant had reason to believe that on the Davis premises:
 "there is now being concealed certain property, namely persons, namely illegal aliens which are the fruits and instrumentalities and evidence of violations of Title 8, United States Code, Sections 1324 and 1325, ..."
 E.R. at 110 and 413.
 Both warrants were issued pursuant to information obtained by INS investigators through their surveillance of the Davis plant. The affidavit in support of the January 1977 survey did not list names of particular persons sought, but consisted of statements made by aliens apprehended while attempting to enter the Davis plant to the effect that they believed other illegal aliens were presently employed by Davis. In addition, the INS investigator affiant stated that he personally "noted that twenty persons of apparent Latin decent (sic) entered (the Davis premises) through the West door." E.R. at 113.
 The affidavit in support of the September 1977 survey warrant contained information regarding an alleged complaint by one of the Davis citizen employees who said she could identify two named workers at Davis who had returned to work after having previously been deported as a result of the January survey. The same complainant suspected that many new hirees were illegal aliens "based on their behavior and comments." Finally, the affidavit stated that an illegal alien apprehended while approaching the outside of the Davis plant stated that she personally knew of four additional unnamed illegal aliens employed at the Davis plant.
 
 
 [6]
 Some agents describe the selective process as one involving the use of factors which may indicate that a person is an alien; e.g., the person's clothing, facial appearance, hair coloring and styling, demeanor (i.e., anxiety or fright), language and accent, and a multitude of subjective factors that one agent described as "multisensory" factors
 
 
 [7]
 Although the Fifth Amendment claim is mentioned in the First Amended Complaint in CV 78-0740-LEW (PX) (ER at 93), and in the Complaint in CV-78-324-LEW (PX), and is addressed briefly in Plaintiffs' Motion for Summary Judgment filed 1/18/80 ER 655-57) (only three pages), the district court never addressed the Fifth Amendment issue in any of its orders, findings or conclusions, and the defendants/appellees never addressed it in their papers below. In view of our disposition, we need not reach these issues
 
 
 [8]
 In any event, the INS admitted during oral argument that reliance on the warrants was limited to justification for the initial entry into the workplaces. We therefore consider the detentive questioning of the workers to have been warrantless and do not pass judgment upon the propriety of the INS' use of such search warrants. Cf. Blackie's House of Beef v. Castillo, 659 F.2d 1211 (D.C.Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982)
 
 
 [9]
 The INS directs our attention to the oft-quoted statement in Terry v. Ohio : "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." 392 U.S. at 19 n.16, 88 S.Ct. 1868 at 1879, 20 L.Ed.2d 889. The facts of this case suggest that questioning during the factory surveys was other than casual, personal intercourse between workers and INS investigators
 
 
 [10]
 The district court also denied both parties' motions for summary judgment and sent to trial the issue of whether the INS policy of stopping and questioning during street encounters amounts to a seizure. The court granted the INS' motion for summary judgment on the issue of whether the INS should be enjoined from the use of "dragnet" search warrants since the INS had informed the court that the agency had abandoned its policy of obtaining such warrants. Finally, the district court refused to modify the preliminary injunction at the request of the INS in order to allow the INS to use civil administrative warrants based upon the D.C. Circuit's ruling in Blackie's House of Beef v. Castillo, 659 F.2d 1211 (D.C.Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982), stating that "(w)arrants to search premises simply do not authorize the seizure of persons found on the premises." Pilliod, 531 F.Supp. at 1020. See also, id., at n. 19
 
 
 [11]
 The stationing of INS agents at factory exits was also present in the search of the H & H factory in Babula v. INS, 665 F.2d 293, 294 (3d Cir. 1981). However, the Third Circuit did not reach the question of whether the agents' presence at the exits in that case rose to a seizure implicating the Fourth Amendment, quite possibly since the court in that case had already determined in Lee v. INS, 590 F.2d 497 (3d Cir. 1979), that any questioning of workers pursuant to 8 U.S.C. § 1357(a)(1) is "limited by the restrictions of the fourth amendment." 665 F.2d at 295. The court in Babula held that the questioning of all of the factory workers at the H & H facility was justified by the "suspicions on the milieu in which the workers were found." 665 F.2d at 296
 
 
 [12]
 The INS position, in the event we find, as we do, that Martinez-Fuerte is inapplicable, apparently is a concession that the Fourth Amendment requires agents to articulate a reasonable suspicion of illegal alienage for detentive questioning. The INS provided the district court with excerpts from the INS Handbook "M-69" entitled "The Law of Search and Seizure for the Immigration Officer," published by the United States Department of Justice, Immigration and Naturalization Service. The Handbook states:
 "To stop and question a person encountered in establishments such as restaurants, factories, or hospitals, or beyond 25 miles from any external boundary of the United States, regarding his right to enter or remain in the United States, an officer must have a reasonable suspicion based on specific articulable facts and rational inferences drawn from those facts that the person is an alien. However, to detain such a person, the officer must have a reasonable suspicion that he is an alien illegally in the United States."
 Memorandum in Support of Defendants' Motion for Summary Judgment, Exhibit H, at 64, C.R. 112 (Footnotes omitted, emphasis added). "Detention not amounting to arrest" is defined as "Temporary forcible restraint, usually for the purpose of conducting further investigation." Id. at 61. A reasonable suspicion that a person is an alien illegally in this country:
 "may be based on such factors as the officer's knowledge of a high concentration of illegal aliens in the area or of recent illegal border crossings, a specific tip from a reliable informant, the subject's excessive nervousness or studied nonchalance upon being in the presence of or questioned by an immigration officer, or the subject's admissions."
 Id. at 60-61.
 Whether the suggested factors sufficiently meet the constitutional standard is another question which we take up in section IV. 3 of this opinion.
 
 
 [13]
 We will assume that the statement referring to "stopping" applies to the facts indicating a detention in this case
 
 
 [14]
 Section 287(a)(1) of the Act, 8 U.S.C. § 1357(a)(1) provides:
 "Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have the power without warrant-
 "(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States; ..."
 
 
 [15]
 See Babula v. INS, 665 F.2d 293, 295 (3d Cir. 1981) (less than an individualized suspicion, but one based upon the "suspicions on the milieu in which the (questioned) workers were found," is sufficient to justify questioning under 8 U.S.C. § 1357(a)(1))
 
 
 [16]
 In Marquez, the district court observed:
 "(W)hatever theoretical appeal there may be to a rule which permits casual, voluntary questions upon suspicion of alienage alone, but requires suspicion of illegality for detention, is in our view substantially undermined by the realities of the matter. It is in the nature of an oxymoron to speak of 'casual' inquiry between a government official, armed with a badge and a gun and charged with enforcing the nation's immigration laws, and a person suspected of alienage. This is particularly so in the context of area control operations as described at trial. In such situations a suspect alien is suddenly confronted by INS officers who have just driven up in an automobile, left the car and directly approached, and immediately queried as to his nationality. For a constitutional rule in these matters to depend on the 'voluntary cooperation' of the suspect is to impose a gloss upon real life. When it is further considered that refusal to cooperate or an attempt to evade such a 'casual encounter,' indeed, even the appearance of nervousness, may well be held to provide reasonable grounds to suspect unlawful presence and therefore to authorize forcible detention, see, e.g., Au Yi Lau v. INS, supra, 445 F.2d at 220; cf. United States v. Oates, 560 F.2d at 45 (2d Cir. 1977) (and cases cited there), the rule urged upon us by the government appears unworkable. Although application of the Fourth Amendment requires courts at times to develop artificial constructs which can never precisely conform to the fluid and infinitely various nature of contacts between government officers and the populace, in formulating such rules a court should not ignore the realities of everyday life."
 
 
 [17]
 See discussion of Babula at section IV.2.b. of this opinion
 
 
 [18]
 Having concluded that no seizure was involved in Tejeda-Mata, the court went on to explain the reasonableness under section 1357(a)(1) of the Immigration Officer's belief as to Tejeda-Mata's alienage justifying the interrogation that took place in that case. The court's discussion as to the statutory standard in Tejeda-Mata could be regarded simply as dicta or it could be seen as this court's acknowledgment that immigration officials, in the absence of a constitutional violation, must meet the statutory standard requiring a reasonable belief in the questioned person's alienage. Since the facts in this case do not require a decision regarding the statutory standard, we decline to clarify the discussion of section 1357(a)(1) in Tejeda-Mata
 
 
 [19]
 See also Brown v. Texas :
 "(E)ven assuming that (prevention of crime) is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it."
 Id. 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979).
 
 
 [20]
 See, e.g., the discussion of the law enforcement problem involved in Martinez-Fuerte, supra, 428 U.S. at 551-53, 96 S.Ct. at 3080
 
 
 [21]
 "To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches ....' "
 Delaware v. Prouse, 440 U.S. at 661, 99 S.Ct. at 1400 (quoting Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)).
 
 
 [22]
 As for the Davis surveys, the INS admits that it was impossible for them to question every worker out of the workforce of from 200-300 workers. Affidavit of Philip Smith, C.R. 14, at 3
 
 
 [23]
 Assuming a factory survey could be, or would be, performed in a non-detentive atmosphere, it is not appropriate in this case for us to provide the INS with a list of justifying factors for such a hypothetical survey. The constitutionality of questioning during such a non-detentive factory survey would be judged upon the specific facts giving rise to each instance of interrogation
 
 
 [24]
 The district court did not abuse its discretion in denying class certification. See James v. Ball, 613 F.2d 180, 186 (9th Cir. 1979), and cases cited therein
 Our holdings today also make it unnecessary to reach the issue of whether the district court correctly dismissed the ILGWU. The effects of our holdings will nevertheless inure to the benefit of the ILGWU.