UNITED STATES, Plaintiff-Appellant,

v.

Charles M. ANDERSON, Sandra Jane Szabo, and Luis Eduardo Ferreira, Defendants-Appellees.

No. 80–1684.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 6, 1981.

Decided Dec. 14, 1981.

As Amended on Denial of Rehearing and Rehearing En Banc April 14, 1982.

Darrell W. MacIntyre, Asst. U. S. Atty., Los Angeles, Cal., for the U. S.

Larry Fidler, Howard R. Price, Los Angeles, Cal., argued, Donald M. Re, Weitzman, Fidler & Re, Victor Sherman, Los Angeles, Cal., on brief.

Before CHOY and ALARCON, Circuit Judges, and BURNS,* District Judge.

JAMES M. BURNS, District Judge:

The government appeals from an order granting the appellees' motions to suppress evidence seized from five pieces of luggage after the appellees were arrested for possession of cocaine. 21 U.S.C. § 841(a)(1). It contends that the appellees are precluded from challenging the search because they lack a reasonable expectation of privacy in the luggage and that, in any case, the evidence was not obtained as the result of an illegal stop or an illegal arrest. We reverse and remand to the district court for further findings of fact, as specified below.

## BACKGROUND

On February 17, 1980, Drug Enforcement Agent (DEA) Elena Cox received information from a confidential informant that a certain Jet Commander aircraft, chartered through Gus Maestrales and piloted by Ben Rhodes and Jean Hauck, would leave Fort Lauderdale, Florida, at approximately 6:00 P.M. Florida time for the Los Angeles area, with a probable destination of the Orange County airport. The informant believed the plane would contain narcotics, though he stated that Rhodes had denied this to Hauck. Agent Cox felt the informant was reliable because he had supplied information to the DEA on two previous occasions which led to 15 arrests and four convictions. Agent Cox had knowledge through the DEA computers that Rhodes and Maestrales were narcotics transporters, though neither had been arrested or convicted for narcotics offenses. She also knew that Winfield Air Center, from which the plane was to depart, had been the site of previous narcotics activity; that Maestrales had an office at the Center; and that drugs are often distributed to the east and west coasts via chartered aircraft, since charter passengers are not required to submit their baggage for inspection under FAA security regulations. She put the aircraft under surveillance, and notified agents in Orange County of the informant's tip and of the plane's anticipated arrival.

In Orange County, five DEA agents (Hoelker, Cathey, McMillan, Bordok and Stewart), along with Los Angeles Police Department (LAPD) Officer Yarnell and his narcotics detector dog, "Frog," awaited the arrival of the plane. The plane landed at approximately 11:45 P.M. (California time), in the middle of a rainstorm. Agents Hoelker and McMillan boarded the plane. Agent Cathey approached Appellee Anderson, who had already deplaned, and was about 50 to 75 feet from the aircraft. Anderson was carrying an attache case. Agent Cathey identified himself and asked Anderson to accompany him to the nearby Martin Aviation Building, where they might speak out of the rain. Anderson agreed to do so and carried the attache case into the terminal. Agent Cathey testified he would have allowed Anderson to depart, had Anderson so chosen, but that he would have detained the attache case in any event.

Meanwhile, Agents Hoelker and McMillan identified themselves before receiving permission to board the plane from Co-pilot

---

* The Hon. James M. Burns, District Judge, District of Oregon, sitting by designation.

Hauck. They then stated they had information there were narcotics on board and "requested" that the passengers, appellees Szabo and Luis Ferreira and Ferreira's wife (not a defendant), retrieve their bags and walk to the aviation building which, at that time of night, had been opened only for the use of the DEA agents. The pilot removed the luggage from the plane. The agents then picked up the luggage and followed the passengers and pilots into the terminal.

Once inside, appellees were placed inside a room approximately 10' × 20' in size. They were accompanied by one or more agents and Orange County deputy sheriffs at all times, including during trips to the restroom and to use the telephone. Shortly after entering the building, the appellees were questioned as to their identity and purpose for travel, and asked to identify the luggage, which had been brought into the room. Although Anderson claimed the attache case, all appellees disclaimed ownership of the two grey suitcases and the two burgundy suitcases. The luggage was then taken into a hallway where "Frog" alerted to the presence of narcotics in the two grey suitcases. Once again the luggage was returned to the appellees' room, and once again they denied ownership of the suitcases. At approximately 1:30 A.M. the appellees were placed under arrest. The pilots were not arrested, presumably because they stated the suitcases had arrived in Fort Lauderdale with the passengers. Shortly before he was taken to the Orange County Jail, Anderson denied ownership of the attache case which he had previously claimed. "Frog" later alerted to the two burgundy suitcases.

On February 18, 1980, pursuant to a search warrant, the DEA agents searched the four suitcases and the attache case.[1] They discovered varying amounts of cocaine in each piece.

In granting the appellees' motions to suppress, the district court ruled that the informant's tip concerning narcotics on the plane which the appellees had chartered, combined with the knowledge of DEA Agent Cox, did not supply reasonable suspicion for detention of the pilots or of the appellees. The court also held that, even assuming the legality of the initial detention, the brief stop quickly ripened into an illegal arrest. According to the court, although the probable cause necessary for arrest (and presumably for the search warrant) was supplied some time later by the alert of the narcotics detector dog, the evidence resulting from the search of the luggage must be suppressed because it was tainted by the illegal stop and arrest.

## DISCUSSION

### A. Abandonment and Reasonable Expectation of Privacy

At the suppression hearing the appellees failed to establish their legitimate expectation of privacy in the luggage searched, relying instead on the "automatic standing" rule of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1968). After that hearing and the district court's initial ruling, the Supreme Court held in *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), that defendants charged with crimes of possession, like all other defendants, may assert the exclusionary rule only if their own

---

1. Although the search warrant authorized the search of all five pieces of luggage, the record does not indicate that the dog ever alerted to the attache case. Anderson did not challenge the sufficiency of the warrant as to the search of the attache case, although his co-defendant, Szabo, did allege that there was no probable cause to search it. We conclude that the magistrate had probable cause to believe there were narcotics in the attache case, and that the warrant was properly issued as to all five pieces of luggage. According to the affidavit of Agent Cathey in support of the search warrant,

the pilots stated that all the passengers had arrived together in a taxi at Ft. Lauderdale, with all the luggage later removed from the aircraft (except the pilots' own carryon bags). The pilots also stated that the suitcases on board the aircraft belonged to the passengers. The fact of Anderson's association with the other passengers and with the four suitcases to which the dog had alerted, made reasonable the magistrate's finding of probable cause to search all the luggage which the passengers had brought on board.

Fourth Amendment rights have been violated. These appellees, who were without the guidance of *Salvucci*, should have an opportunity to try to establish their reasonable expectation of privacy in the luggage searched. If successful in this regard, they will have demonstrated their right to challenge the search to which they object,[2] unless their denials of ownership of the luggage were sufficiently clear to establish abandonment.[3]

> If a person has voluntarily abandoned property, he has no standing to complain of its search or seizure ... The issue of abandonment is a factual one.... It is primarily a question of intent, and intent may be inferred from words, acts, and other objective facts. Abandonment here

is not meant in the strict property-right sense, but rests instead on whether the person so relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search.

*United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976). *Accord, U. S. v. Kendall*, 655 F.2d 199, at 201 (9th Cir. 1981); objective, not subjective test governs determination of intent (or lack thereof) to abandon.

■ Since the district court failed to make findings as to whether the appellees demonstrated a reasonable expectation of privacy in the luggage, and if so, whether their words and acts constituted an abandonment of that privacy interest, we remand for such determinations.[4]

---

2. It is not clear whether appellees also challenge the removal of the luggage from the airplane. Detention of luggage is lawful, at least initially, if based on reasonable suspicion. *United States v. Martell,* 654 F.2d 1356 (9th Cir. 1981). The legality of the continuing detention of luggage depends on whether such detention is reasonable, in light of all the surrounding circumstances. *United States v. Van Leeuwen,* 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970) (investigatory detention of first class mail for 29 hours was not unreasonable in the particular circumstances).

3. For a general discussion of abandonment in a different context, *see United States v. Sledge,* 650 F.2d 1075 (9th Cir. 1981) (question of whether a person has abandoned property turns not on an actual expectation of privacy, but rather on the *exhibition* of an actual expectation of privacy).

4. This case is to be distinguished from *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), in which the Supreme Court refused to remand a case to the district court for re-examination of the factual question of whether the defendant had demonstrated a violation of his own Fourth Amendment rights. In that case, the police had searched a home without a search warrant, purely on the authority of an arrest warrant for a third party. They found cocaine in the home, and the defendant was arrested on federal drug charges. In both the district court and the court of appeals, the government failed to challenge the defendant's reasonable expectation of privacy in the house searched, assuming that the "automatic standing" rule of *Jones* precluded such a challenge. The Supreme Court held the government could not argue for the first time before it that the

petitioner lacked an expectation of privacy. The Court warned that

> [t]he Government ... may lose its right to raise factual issues of this sort before this Court when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation.

*Id.* at 209, 101 S.Ct. at 1646. In a footnote, the Court rejected the government's objection that it was unable to raise the issue in the courts below because both courts had acted before the *Salvucci* decision. First, the Court explained, its earlier reasoning in *Rakas v. Illinois,* 439 U.S. 421, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), was "clearly an ill omen for the continuing vitality" of *Jones,* and should have served to warn the government it must challenge the privacy interest of a defendant charged with a possessory offense. *Steagald v. United States, id.,* 451 U.S. at 211, 101 S.Ct. at 1647 n. 5. Second, *Salvucci* was decided before the defendant sought certiorari,

> but rather than oppose certiorari on the ground that the petitioner lacked a legitimate expectation of privacy in the searched home, the Government made explicit concessions to the contrary.

*Id.*

In the instant case, the district court's initial ruling granting the motions to suppress also occurred before the Supreme Court reached its decision in *Salvucci.* However, unlike the situ-

■ Assuming, for purposes of analysis, that the appellees are able to establish their privacy interest in the luggage, and that the district court finds their denials of ownership constituted an abandonment, the question of whether they may challenge the search is not yet resolved. Admissibility of the evidence of abandonment ·turns upon the legality of their detention. Denials of ownership may be considered as evidence of abandonment of a privacy interest only if they occur during a lawful detention. Any denials which occur during an illegal investigatory stop, or after a lawful detention becomes unlawful (for example, as is alleged here, after it develops into an arrest without probable cause) are tainted and cannot be considered. *United States v. Jackson, supra,* 544 F.2d at 410.

## B. *Legality of the Stop*

The district court assumed this was initially a *Terry* investigative stop *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and found that the agents lacked a "reasonable suspicion" of criminal activity to justify such an intrusion into the privacy of the pilots and the appellees, who were passengers on the plane. *United States v. Brignoni-Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

■ The government first contends the encounter between the agents and the appellees did not constitute a "seizure" within the meaning of the Fourth Amendment. Consequently, the agents did not need a "reasonable suspicion" to question the appellees. The government relies on *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) for this proposition. In that opinion two of the justices found that the encounter between two DEA agents and the defendant in an airport did not constitute a "seizure" within the meaning of the Fourth Amendment, since the agents (who wore no uniforms and did not display weapons) had stopped and briefly questioned her in a public place. Justice Stewart articulated the test for a "seizure" as follows:

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* at 554, 100 S.Ct. at 1877. (It should be noted that a majority of the justices assumed that the stop of Mendenhall did constitute a seizure.)

■ Applying the test as expounded by Justice Stewart, the encounter in this case was clearly a "seizure," if not on the plane, then within the aviation building. There are several circumstances in this case, not present in *Mendenhall,* which would indicate to a reasonable person that he or she

ation in *Steagald,* the government never conceded the issue before the district court, and in fact challenged the appellees' privacy interest on two grounds: 1) the appellees failed to assert a proprietary or possessory interest in the luggage, and 2) they abandoned any privacy interest they might have demonstrated. At the evidentiary hearing, the government attempted to raise the first issue by asking Ferreira whether he claimed any interest "even today" in any of the suitcases; it also elicited testimony regarding the appellees' denials of ownership.

In only one sense was the government dilatory about raising the issue of the appellees' right to challenge the search. At the time the Supreme Court decided *Salvucci,* the district court had preliminarily granted the appellees' motions to suppress, but had deferred its final ruling pending the submission of supplemental briefs by the parties and further consideration by the court of another issue. During that interim period, the government could well have requested that the evidentiary hearing be reopened for a determination of the defendants' privacy interests, pursuant to the mandate of *Salvucci.* However, we do not feel that this omission constitutes failure to raise the question in a timely fashion, and should not preclude the government in this instance from challenging the appellees' reasonable expectation of privacy.

was not free to walk away: 1) the presence of five DEA agents, one LAPD officer, plus four uniformed Orange County deputy sheriffs; 2) testimony from the appellees that they were told or ordered to leave the plane, as opposed to "requested" to leave, as stated by the agents; 3) the physical escort of the appellees by the agents approximately 150 feet at night in a rainstorm to a terminal closed to the public; 4) placement in a room approximately 10′ × 20′ in size; and 5) the constant presence of at least one agent or officer, even during trips to use the restroom or telephone.

Unlike the *Mendenhall* situation, these events did not take place "in the public concourse." *Id.*, 100 S.Ct. at 1877. The approach of the agents to the plane was more like a vehicle stop than the stop of a pedestrian on a public street. In the *Mendenhall* opinion, Justice Stewart distinguished investigatory stops of automobiles, stating that they do constitute seizures, and noting that the stop of an automobile provides "the opportunity for a visual inspection of areas of the passenger compartment not otherwise observable [which is] materially more intrusive than a question put to a passing pedestrian." *Id.* 100 S.Ct. at 1878.

The government next argues that if the encounter was a seizure (an investigatory stop), it was based on reasonable suspicion. The district court found that the informant's tip was too tentative and vague to provide a reasonable suspicion to justify the stop, and that Agent Cox's general knowledge of the patterns of transportation of narcotics by chartered planes, and her specific knowledge of the previous involvement in drug transportation of the owner and pilot, were insufficient to fill the void. It found this information did not allow for a brief detention of the pilots or *a fortiori*, of the passengers, about whom the DEA had no information.

 The district court was clearly erroneous in concluding that the initial stop was not based on reasonable suspicion. The tip was not completely lacking in indicia of reliability, and consequently warranted either no police response or further investiga-

tion before a stop could be justified. *Adams v. Williams*, 407 U.S. 192, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Sierra-Hernandez*, 581 F.2d 760 (9th Cir. 1978), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333. The informant had previously provided accurate information about narcotics violations. The tip was precise as to the plane, pilots, time of departure and destination of the flight. The informant's belief that there were narcotics on board was not based on personal observation, but on his acquaintanceship with the pilots and owner, and his knowledge that on a previous flight to the same destination the co-pilot, Hauck, had observed a passenger returning with large amounts of cash.

The assessment of adequate cause to make the investigatory stop must be based not only on the tip, but on all the circumstances.

> The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of law-breakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.
>
> The process does not deal with hard certainties, but with probabilities.

*United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Essential to a finding of reasonable suspicion here is Agent Cox's knowledge that Winfield Air Center (from which the plane was to depart) was a site of previous narcotics activity, that the pilot and the owner were known to the DEA to be drug transporters, and that chartered aircraft are frequently used by persons transporting narcotics, in order to avoid submitting luggage to inspection pursuant to FAA regulations. Also, the appellees were not stopped until the plane arrived at its destination. The arrival of the plane at the Orange County airport partially verified the tip.

 This information does provide more cause to stop the pilots than the passengers. Certainly, "the detaining officers

must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez, id.* at 417, 101 S.Ct. at 695. However, where officers reasonably suspect a vehicle of transporting illegal aliens, they are justified in stopping and questioning the driver and passengers of the vehicle as to their citizenship and immigration status. *United States v. Cortez, id.* at 421–22, 101 S.Ct. at 697; *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Likewise, where officers reasonably suspect a chartered aircraft of transporting narcotics under circumstances such as these, they may stop and question all of its occupants. In this case, the agents could legitimately have questioned the appellees regarding their relationship with the pilots and their knowledge of the presence of narcotics.

Aided by insight provided us by *United States v. Cortez,* which was not available to the district court, we hold that the detaining agents, as trained officers, were justified in drawing inferences and making deductions as to the probability that the aircraft was carrying narcotics, and—on the basis of those deductions—stopping its occupants for questioning.

### C. *Continuing legality of the detention*

■■■■■ This circuit has articulated the test for determining the lawfulness of detentions as "whether, under the totality of the circumstances, it is reasonable. One of the factors in the assessment of their reasonableness is the extent of the detention." *United States v. Richards,* 500 F.2d 1025, 1029 (9th Cir. 1974). In *Richards,* as in this case, the defendants were stopped while on board a private airplane and, due to weather conditions, taken inside the airport terminal building. They were questioned both while on the airstrip and inside the building, and detained for over an hour. The court held that in those particular circumstances, the detention was reasonable.

■■ Here, given the initial conclusion by the district court, we are at sea in trying to either apply or distinguish *Richards* in evaluating the correct length of detention. Based upon counsel's statements at oral argument it would seem that the first "sniffing" of the luggage by the dog, which established probable cause for arrest, may have occurred as early as 45 minutes after the detention commenced.[5] But we do not know; factual findings are for the district court. Also, the precise time when the lawful detention ripened into an unlawful arrest, if it did so at all, "is a question of fact which depends on an evaluation of all the surrounding circumstances." *United States v. Richards,* 500 F.2d at 1028. Obviously, the length of time of the detention is only one of the various circumstances to be evaluated; so also, is the precise point in time upon entry into the building that appellees disclaimed ownership of the luggage. Since the district court did not make findings as to these facts, we remand for a determination of just when the denials of luggage ownership were made, the length of the investigatory stop, and how long it continued to be lawful.

On remand, the District Court should also evaluate these matters in light of the recent decision of this Court in *U. S. v. Martell,* 654 F.2d 1356 (9th Cir. 1981). In *Martell,* this Court refused to suppress evidence obtained from suitcases detained for about 20 minutes before "sniffing" by a narcotics detector dog revealed the presence of cocaine. Founded suspicion existed justifying the detention, and the suitcases were opened and searched after a warrant was obtained. It was unnecessary to decide lawfullness of detention of the persons in *Martell* because nothing occurring during the detection, e. g. no interrogation occurred, even if the detention of the persons became unlawful because of its length, it did not contribute to (so as to taint) "the search and seizure of the suitcases," 654

---

5. There are indications in the record that some witnesses may have estimated the time between the appellees' entry into the building and the dog's alert to the cocaine in the suitcases to be as little as 10 minutes (witness Yarnall, Rep.Tr. pp. 173–174), or 20–25 minutes (witness Bordok, Rep.Tr. p. 251).

F.2d at 1361. On remand, the District Court should also evaluate this aspect, if it concludes that the detention of the appellees became unlawful because of its length.

### Conclusion

On remand, the district court should make several findings of fact before it rules on the motions to suppress. Its initial consideration must be whether the appellees had a reasonable expectation of privacy in the luggage searched. In order to resolve this issue, the court should make findings as to the following questions: 1) whether the appellees have shown a sufficient connection to the luggage to establish their reasonable expectation of privacy in it; 2) whether their denials of ownership constituted a clear abandonment of such privacy interests; 3) when those denials occurred; 4) the length of the detention (from the initial stop until the dog's alert); and 5) at what point, if any the DEA agents exceeded the scope of the lawful investigatory stop.

Once these findings have been made, it should be clear whether the denials of ownership by each appellee occurred during a lawful detention. (We note that Anderson's denial of ownership of the attache case came some time after his original claim of ownership, and after the denials of all of the appellees concerning the four suitcases. Consequently, it must be considered separately.) If the statements of denial occurred while the initial detention was still lawful, and if they constituted an abandonment of the appellees' privacy interests, the motions to suppress must be denied.

Reversed and remanded for further proceedings consistent with this opinion.