UNITED STATES of America, Plaintiff,

v.

Yusuf D. REEVES, Defendant.

No. CR–92–124–JLQ.

United States District Court,
E.D. Washington.

July 9, 1992.

---

Ronald W. Skibbie, Asst. U.S. Atty., Spokane, Wash., for plaintiff.

Michael J. Kennedy, Asst. Federal Defender for Eastern Wash., Spokane, Wash., for defendant.

## ORDER DENYING MOTION TO SUPPRESS

QUACKENBUSH, Chief Judge.

BEFORE THE COURT is Defendant's Motion to Suppress (Ct. Rec. 21), heard on June 12, 1992. Assistant United States Attorney Ronald W. Skibbie appeared on behalf of the Government; Defendant was represented by Michael J. Kennedy. Having reviewed the record, heard from counsel, and being fully advised in this matter, this order is intended to memorialize the court's oral ruling.

## FACTUAL BACKGROUND

After reviewing the evidence and testimony presented during the June 12, 1992 suppression hearing, the court makes the following factual findings:

On or about November 11, 1991, United States Border Patrol Officer Paul K. Erni was driving east on I-90 just outside of Medical Lake, Washington. Officer Erni was in uniform and driving a marked United States Border Patrol unit. His vehicle did not have overhead lights, but did have large United States Border Patrol emblems on the side doors. Officer Erni was on duty and patrolling for illegal aliens along the I-90 corridor when he noticed a grey Chevrolet Citation being driven by the Defendant, Yusuf D. Reeves, a black male. Officer Erni testified that the Defendant was doing nothing illegal. However, as he was passing the Defendant, Officer Erni glanced sideways towards the Defendant's vehicle and noticed that he was wearing a shower cap and talking on a cellular phone. This grabbed the officer's attention. Consequently, Officer Erni pulled in behind the Defendant and began to follow him. Officer Erni stated that, in his experience, drug dealers often use beepers and/or cellular phones to conduct their business, and I-90 is a common drug courier route. Officer Erni also suspected that the Defendant had gang affiliations.

While he was trailing the Defendant, Officer Erni ran a license plate check on the Defendant's vehicle. This check revealed that the vehicle had not been reported stolen, nor were there any outstanding warrants issued for the registered owner. It is undisputed that Officer Erni did not have probable cause to stop the Defendant at this point, but the officer's suspicion persisted so he continued to follow the Defendant's vehicle. As he was observing the Defendant, Officer Erni noticed that the Defendant's speed was increasing to approximately 85 miles per hour. Officer Erni also noticed that the Defendant was glancing at him through his rear-view mirror.

Officer Erni testified that his speedometer maxed out at 85 miles per hour, but in

his estimation the Defendant was traveling in excess of 90 miles per hour on the downgrade approaching downtown Spokane.[1] Because the Defendant was greatly exceeding the posted speed limit, he was rapidly approaching and passing other vehicles. According to Officer Erni, this was done by a series of quick, erratic lane changes executed, at times, without proper signalling, and while continuing to talk on a cellular phone with one hand on the wheel. In Officer Erni's opinion, the Defendant could not have had complete control of his vehicle because his speed was exceeding reasonable levels for that day.

As the Defendant reached the more congested areas of Spokane, his speeds decreased somewhat. However, he continued to make lane changes that Officer Erni considered to be evasive. It was not until the Defendant approached the Sprague exit, where I–90 converges from three to two lanes, that the Defendant finally reduced his speed below the posted limit.

While Officer Erni was following the Defendant, he made radio contact with the Washington State Patrol and informed them that he was behind a silver vehicle that had just been traveling at speeds in excess of 90 miles per hour. Officer Erni also described the vehicle and the vehicle's driver. However, Officer Erni did not convey his suspicion that the vehicle's driver might have gang affiliations.

The Defendant exited I–90 on Argonne and proceeded south. Awaiting at the intersection of Argonne and I–90 were two Washington State Patrol units, one driven by Trooper Ladines and the other driven by Trooper Bambino. As the Defendant passed the marked Washington State Patrol units, Officer Erni, who was in direct radio contact with the units, identified the Defendant's vehicle. The troopers proceeded to fall in behind the Defendant, and shortly thereafter Trooper Bambino activated his overhead lights. The Defendant then pulled over and parked his vehicle in a convenience store parking lot. Officer Erni also arrived on the scene to observe and to brief the troopers on his earlier observations.

Trooper Bambino approached the Defendant's vehicle and asked him for his operator's license and vehicle registration. At no time during the events in question did any of the officers draw their weapons. After the Defendant failed to produce a valid driver's license and gave the officers several different derivatives of his name and dates of birth, Trooper Ladines placed him under arrest for reckless driving and for driving without a valid operator's license. The Defendant was then handcuffed, Mirandized, and placed in back of the trooper's patrol car.

The officers observed that the Defendant was wearing a shower cap and was dressed in black clothing, some of which bore the insignia of the Los Angeles Raiders football team. The officers believed that individuals associated with gangs often wore similar clothing.

Looking for weapons, Trooper Ladines and Officer Erni then conducted a visual search of the vehicle's passenger compartment from the exterior of the vehicle. Trooper Ladines then made a search of the front passenger area and the glove box, looking for weapons and identification. Officer Erni also used his canine to "sniff" the atmosphere around the exterior of the Defendant's vehicle. Nothing was discovered during any of these searches; however, the officers continued to feel that the Defendant was concealing something.

As a result, Trooper Ladines brought the Defendant out of his vehicle and unhandcuffed him. The Defendant was then handed a consent to search form and asked if he would consent to a search of his vehicle. This particular consent form was normally used by Officer Erni for consensual searches of premises, so Officer Erni recorded the vehicle's license plate number

---

1. The speed limit where Officer Erni first noticed the Defendant is 65 miles per hour. However, traveling in an eastward direction from Medical Lake, towards Spokane, the speed limit changes to 55 miles per hour. Officer Erni did not recall at what point the speed limit changed, but the court takes judicial notice of the fact that the speed limit on the hill descending from the Spokane International Airport area into the downtown Spokane area is 55 miles per hour.

in the upper left-hand corner in order to signify that consent was being given to search the Defendant's vehicle. The Defendant read the consent form and was also orally informed by Officer Erni that he had a right.to refuse the request to search. The Defendant then signed the consent to search form.

After the consent form was signed, Officer Erni had his canine conduct an interior search of the passenger compartment of the Defendant's vehicle. Officer Erni noticed no change in the canine's behavior that would indicate the presence of secreted narcotics or contraband in the vehicle.

The Defendant was then asked if the officers could search the hatchback portion of his vehicle. The Defendant orally consented to a search of the hatchback. After the officers opened the hatchback, they discovered two sport bags and a black briefcase. These items were presented to Officer Erni's canine. When the canine approached the briefcase, he did scratch and nip at it, but Officer Erni interpreted it as a false alert. A subsequent search of the sports bags revealed no contraband. The briefcase was locked and when asked about it, the Defendant stated that it was not his, it was his cousin's. The officers then asked if they could search the briefcase. According to Officer Erni, the Defendant did not seem to mind if they searched the briefcase, but he acknowledged that the Defendant did not affirmatively consent to the search. Trooper Ladines initially testified that the Defendant refused the officers' request to search the briefcase; however, Trooper Ladines immediately retracted that answer and stated that the Defendant said "go ahead."

Apparently, Officer Erni had a briefcase similar to the one in the Defendant's vehicle. Officer Erni was able to open the locked briefcase by turning the combination on the lock to "000." There was no evidence presented that the Defendant provided Officer Erni with the "000" combination. When the briefcase was opened, the

officers observed a loaded .38 Special, a razor blade, and two small white chunks of a substance that later field-tested positive as crack cocaine. The Defendant's driver's license was also in the briefcase.

The Defendant, a previously-convicted felon, was indicted on April 21, 1992 for being a felon in possession of a firearm. The Defendant now moves the court for an order suppressing the physical evidence seized and the oral statements given.

## DISCUSSION

The Defendant argues that suppression is necessary because his arrest was pretextual and not based on probable cause and, therefore, unconstitutional, in violation of the Fourth Amendment. The Defendant also questions the propriety of the warrantless search of the locked briefcase.

### I. *The Arrest*

It is settled that an arrest may not be used as a pretext to search for evidence. *United States v. Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932). Whether an arrest is a mere pretext to search turns on the motivation or primary purpose of the arresting officers. *Williams v. United States*, 418 F.2d 159, 161 (9th Cir.1969); *United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir.1986). "Courts have found improper motivation where the defendant is arrested for a minor offense so as to allow police to search for evidence for some other unrelated offense for which police lack probable cause to arrest or search." *Smith*, 802 F.2d at 1124.

The Government argues that the proper test focuses on whether the officers did anything that was objectively unlawful. This test has been adopted by the Fifth Circuit. *See United States v. Causey*, 834 F.2d 1179, 1185 (5th Cir.1987). However, the holding in *Causey* appears to conflict with the law in the Ninth Circuit as set forth in *Williams* and *Smith*.[2] As noted

2. The Government also cites *United States v. Baker*, 850 F.2d 1365 (9th Cir.1988) in support of its position. However, *Baker* does not stand for the proposition that a stop and subsequent

search is constitutional so long as nothing was done which was objectively unlawful. *Baker* merely states that in order to execute a stop, an officer must have an objective basis for believ-

above, these cases hold that the motivation or primary purpose of the officer is dispositive in determining when an arrest is a mere pretext to search. If this court were to adopt a pure objective standard, it would not only be in conflict with *Williams* and *Smith*, it would effectively eliminate the pretext rule itself. If a police officer only had to avoid acts which were objectively unlawful, he or she could utilize lawful means to arrest a suspect on a minor charge in order to search for evidence of some other unrelated offense for which probable cause to search was lacking. The pretext rule seeks to prevent the utilization of arrests as search warrants. *See Smith,* 802 F.2d at 1125; *Taglavore v. United States,* 291 F.2d 262 (9th Cir.1961). By requiring a subjective analysis of the officer's primary motivation and purpose for an arrest, this goal is accomplished.

■ The Defendant appears to assert that he was stopped because of the officers' suspicion that he was a gang member or drug dealer based on his race. If this were the case, it would constitute an invalid basis for a stop. However, the court finds that the Defendant was stopped because he was driving recklessly, not because of his race.

Under Washington's reckless driving statute: "Any person who drives any vehicle in a willful or wanton disregard for the safety of persons or property is guilty of reckless driving." RCW 46.61.500. The unlawful operation of a vehicle in excess of the maximum lawful speed is prima facie evidence of the operation of a motor vehicle in a reckless manner by the operation thereof. RCW 46.61.465. The court finds that the Defendant was driving in excess of 85 miles per hour in both 55 and 65 miles per hour zones, while weaving in and out of traffic without the use of signals, and while talking on a cellular phone. This type of conduct is indicative of a willful

disregard for the safety of others, and not only gave the troopers sufficient cause to stop the Defendant, but compelled them to do so in the name of public safety.

The Defendant also cites *United States v. Cruz,* 581 F.2d 535, 539 (5th Cir.1978) in support of his position that he was stopped based on an invalid purpose. In *Cruz,* an officer was found to have stopped a vehicle only for the purpose of inspecting its occupants, despite his assertion that the purpose of the stop was to inform the driver of an illegal U-turn. The court in *Cruz* found that the stop was illegal because it was based on an invalid purpose.[3]

In *Cruz,* the court did not find the officer's testimony regarding the purpose of the stop credible, but instead found that the officer's reason for the stop was to illegally search for aliens. However, the officers' testimony here was credible and the court finds that when the Defendant was stopped for reckless driving, he was stopped for a valid purpose. Therefore, *Cruz* is distinguishable.

The court is troubled by the fact that Officer Erni followed the Defendant because he believed that the Defendant may have been involved with gangs. An INS officer's primary responsibility is to enforce the immigration laws, not to patrol the nation's highways for suspected drug dealers or gang members. Nevertheless, the Defendant has offered nothing to suggest that he was *stopped* for anything other than the fact that he was driving recklessly. He has offered no facts which would allow the court to conclude that the officers' motivation or primary purpose underlying the stop was anything other than to protect the public and arrest the Defendant for reckless driving.

■ Probable cause to arrest arises when officers have facts and circumstances within their knowledge sufficient to war-

---

ing that the suspect has committed a traffic violation. *Id.* at 1368–69. The portion of the opinion that discusses an objective standard does not purport to authorize an arrest as a pretext to search for evidence merely because the officer's conduct was not objectively unlawful.

3. The "invalid purpose" test used by the court in *Cruz* was subsequently overruled in favor of a pure objective test by the court in *United States v. Causey,* 834 F.2d 1179, 1184 (5th Cir.1987).

rant a reasonable belief that a suspect has committed or was committing a crime. *United States v. Fouche,* 776 F.2d 1398, 1403 (9th Cir.1985). Based on the information provided by Officer Erni, Trooper Ladines had more than probable cause to believe that the defendant was guilty of reckless driving. There was nothing presented to the court that would indicate the Defendant's arrest was not in accord with Washington State Patrol procedures, and the court is satisfied that Trooper Ladines did not abuse his discretion when he arrested the Defendant. Based on the Defendant's reckless driving, Trooper Ladines could have reasonably felt that the Defendant was a threat to the safety of others. Therefore, the court finds that the stop and arrest of the Defendant were not based on an invalid purpose, or as a pretext used to search the Defendant or his car.

## II. *The Search*

The Government acknowledges that the officers did not have a search warrant, nor probable cause to search the Defendant's vehicle, but it is also undisputed that the Defendant gave the officers consent to search his vehicle. There are, however, several issues relating to the propriety of the search of the briefcase.

A. Reasonable Expectation of Privacy

■ The touchstone of a Fourth Amendment analysis is whether an individual has a "constitutionally protected reasonable expectation of privacy." *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). In order to establish a reasonable expectation of privacy, an individual must manifest a subjective expectation of privacy in the object of the challenged search and society must recognize that expectation as reasonable. *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986). However, an individual can abandon his reasonable expectation of privacy in a piece of property. "If a person has voluntarily abandoned property, he has no standing to complain of its search or seizure." *United States v. Anderson,* 663 F.2d 934, 938 (9th Cir.1981).

The basis of this principle is that upon abandonment, an individual loses his or her legitimate expectation of privacy in the item searched. *United States v. Veatch,* 674 F.2d 1217, 1220 (9th Cir.1981).

> The issue of abandonment is a factual one.... It is primarily a question of intent, and intent may be inferred from words, acts, and other objective factors. Abandonment here is not meant in the strict property-right sense, but rests instead on whether the person so relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search.

*Anderson,* 663 F.2d at 938. An objective test governs determination of intent to abandon. *Id.*

In response to the officer's inquiry concerning the ownership of the briefcase, the Defendant allegedly stated that the briefcase was his cousin's, not his. It is this statement that places into question the Defendant's reasonable expectation of privacy in the briefcase. Specifically, the issue is whether the Defendant's statement constituted abandonment for Fourth Amendment purposes.

■ At first blush, it may appear that by denying ownership of the briefcase, the Defendant objectively abandoned any Fourth Amendment interest he had therein. However, ownership is not required to assert a reasonable expectation of privacy. *United States v. Padilla,* 960 F.2d 854, 859 (9th Cir.1992). It may well be that the Defendant would have abandoned his Fourth Amendment interest if he had unequivocally denied any interest in the briefcase. However, this is not what he did. The Defendant simply told the officers that the briefcase was his cousin's. This statement, taken together with the fact that the briefcase was located in the Defendant's vehicle, objectively indicated that the Defendant was in possession of the briefcase not as an owner, but rather as a bailee. The court finds that the Defendant's statement regarding the ownership of the briefcase did not amount to abandonment; rath-

er, it accurately portrayed the Defendant's purported title to it.

 The Ninth Circuit has held that Fourth Amendment standing can be based on a shared bailor/bailee relationship. *See Padilla,* 960 F.2d at 859; *United States v. Johns,* 707 F.2d 1093 (9th Cir.1983), *rev'd on other grounds,* 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985). Further, the Sixth Circuit has held that a "suitcase or briefcase is property of a kind in which an owner or *bailee* normally has a strong expectation of privacy." *United States v. Oswald,* 783 F.2d 663, 666 (6th Cir.1986) (Emphasis added). Consequently, this court finds that because the Defendant purported to be a bailee of the briefcase, and because the briefcase was locked and stored in the Defendant's vehicle, he manifested a subjective expectation of privacy in the briefcase that was objectively reasonable.

The Eleventh and Eighth Circuits have faced abandonment issues similar to the one in this case. However, those cases are distinguishable.

In *United States v. McBean,* 861 F.2d 1570 (11th Cir.1988), McBean consented to a search of his car. When the police found nothing, they opened the trunk and found two pieces of luggage. When asked whose they were, McBean said they were not his. McBean denied ever looking into the luggage and also denied knowledge of the contents of the luggage. The court held that McBean had no legitimate expectation of privacy in the luggage and thus found that the district court's implicit finding to the contrary was clearly erroneous. The court's holding was based on the fact that McBean, when asked about the luggage, stated without reservation and unequivocally that the luggage was not his, and that he did not know what the luggage contained. *Id.* at 1574.

There were three facts which the court in *McBean* relied on in determining that McBean had abandoned his expectation of privacy in the luggage: his denial of ownership, his denial that he ever looked in the luggage, and his denial that he knew what was in the luggage. In the Ninth Circuit,

one does not need to be an owner to claim a reasonable expectation of privacy in the object of a search, *Padilla,* 960 F.2d at 859, so the fact that an individual denies ownership of an item does not mean he has abandoned his reasonable expectation of privacy therein. Therefore, for *McBean* to be applicable here, the other two facts relied on by the court in *McBean* would have to be present, which they are not. In the case at bar, the Defendant did not state that he never looked inside the briefcase, nor did he disclaim knowledge of what the briefcase contained. Because of the factual dissimilarities between *McBean* and this case, this court does not find *McBean* persuasive.

In *United States v. Monie,* 907 F.2d 793 (8th Cir.1990), Monie was hired to drive a rented automobile across country with knowledge that there were two locked suitcases filled with narcotics in the trunk. Monie was pulled over for speeding, but could not produce a valid driver's license, nor could he answer the officer's questions concerning his destination. He consented to a search of the passenger compartment and voluntarily unlocked the trunk. When asked about the two locked suitcases in the trunk, Monie denied ownership, disclaimed any interest in their contents, and stated that he did not have a key for them. The officers forced their way into the suitcases and found drugs. Monie never objected to the search, but later contended that his consent did not extend to the search of the locked suitcases.

In holding that Monie did not possess a legitimate expectation of privacy in the two locked suitcases, the court stated that Monie failed to establish that he treated the locked suitcases as objects he "sought to preserve as private." *Id; (citing Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)). The following are the facts the court cited in support of its holding: Monie knew the contents of the suitcases belonged to someone else, Monie did not have permission to open the suitcases or means of access to their contents, he did not keep any of his belongings in the suitcases, he did not step in to

protect the suitcases when they were being searched, and Monie had no interest in the suitcases or their contents.

Unlike the defendant in *Monie*, the Defendant here did not deny knowledge of the briefcase's contents, nor did he deny knowing the briefcase's combination. Although it is significant that the Defendant here did not deny knowledge of the briefcase's contents or its combination, the critical factor, and the one that distinguishes *Monie* from this case, is that the Defendant here did not disclaim all interest in the briefcase.

As ownership *per se* is not required for a reasonable expectation of privacy, the fact that an individual denies ownership of an item searched does not mandate a conclusion that abandonment occurred. However, as the Fourth Amendment only protects personal interests, a person must claim some personal interest in the item searched in order to claim protection under the Fourth Amendment, whether it be an ownership interest or a bailee/bailor interest. In *Monie*, Monie not only denied owning the suitcase, he also denied having any interest in the suitcase at all, which in and of itself prevented him from claiming a reasonable expectation of privacy therein. This is in contrast to the case at bar, where the Defendant did not disclaim all interest; rather, he stated that his cousin was the owner. By so stating, the Defendant impliedly asserted that he was holding the briefcase as a bailee.

The Ninth Circuit has also held that an individual can abandon his or her reasonable expectation of privacy, thereby relinquishing Fourth Amendment protection. *See United States v. Veatch*, 674 F.2d 1217 (9th Cir.1981); *Lurie v. Oberhauser*, 431 F.2d 330 (9th Cir.1970). However, these cases are also distinguishable from the case at bar because in both cases the suspects disclaimed all interest in the item searched, not just an ownership interest, as was the case here.[4]

In sum, the court concludes that the Defendant, as a bailee, possessed a reasonable expectation of privacy in the briefcase, which was objectively reasonable. Further, the Defendant's statement that the briefcase was his cousin's, not his, did not constitute an abandonment of the reasonable expectation of privacy he held in the briefcase. Therefore, the Defendant has "standing" to challenge the search of the briefcase.

**B. Voluntariness of the Consent**

First, the Defendant argues that his consent was tainted by the illegal pretextual stop and arrest. However, this argument is moot because the court has already determined that the Defendant's arrest was valid.

■■■ The Defendant also argues that undue force or intimidation was used to obtain the consent. It is settled that consent to search must be voluntarily given and "voluntariness is a question of fact to be determined from all of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973). The Defendant stresses that custodial consents are subject to greater scrutiny because of the psychological atmosphere in which the consent is obtained. As the Ninth Circuit has pointed out, the psychological atmosphere is a critical factor which must be weighed with the totality of the circumstances in determining whether consent is voluntary. *United States v. Rothman*, 492 F.2d 1260, 1264–65 (9th Cir.1973). However, "the fact that consent was given while under arrest, does not, in and of itself, make the consent involuntary, especially where the defendant was informed of his right not to consent." *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir.1990).

■■■ Here, the Defendant was Mirandized and was told that he had the right not to consent to a search. Further, after be-

---

**4.** In *Veatch,* the suspect "denied any ownership or interest" in the item searched, *Veatch,* 674 F.2d at 1219, while in *Lurie* the suspects denied having any ownership or knowledge of the item searched. *Lurie,* 431 F.2d at 333. The court in *Lurie* held that "[t]he right to protection against

unreasonable search and seizure is personal and a defendant in a criminal case who *claims no proprietary or possessory interest* in the seized property has no standing to object to its admission in evidence on Fourth Amendment grounds." *Id.* (Emphasis added).

ing removed from the patrol car and un-handcuffed, the Defendant read and signed a consent to search form. Moreover, none of the officers involved drew their weapons at any time during the events in question. The court finds no evidence that the Defendant's consent was obtained through the use of threats or coercion. The court is satisfied that the Defendant's consent to search was freely and voluntarily given.

### C. Scope of Oral Consent to Search Hatchback

■ After consent was obtained to search the Defendant's vehicle and a search of the vehicle's interior revealed no contraband, Officer Erni obtained an oral consent to search the hatchback section of the vehicle. The question is whether it was reasonable for the officers to interpret this consent as authorizing the search of the briefcase. The court finds that it was not.

In *Florida v. Jimeno*, —— U.S. ——, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), the Supreme Court commented on the scope of a general oral consent to search a vehicle. In *Jimeno*, the suspect gave police consent to search his vehicle for the presence of illegal narcotics. While searching the automobile, the officers found a folded, brown paper bag, which contained a kilogram of cocaine. The Court held that the search of the brown paper bag was within the general consent to search, stating that the scope of a consensual search is defined by its object. *Id.* 111 S.Ct. at 1804. The Court noted that the suspect's consent to search the automobile did not place any explicit limitation on the scope of the search and that the police informed the suspect that the subject of the search was narcotics. *Id.* The Court concluded that it was "objectively reasonable for the police to conclude that the general consent to search

[the suspect's] car included consent to search containers within the car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of container." *Id.*

There are two principal reasons why the general *Jimeno* rule does not apply in this case. First, the Defendant here was not expressly told that the proposed search was for narcotics.[5] *Jimeno* holds that a general consent to search a vehicle enables police to search containers located in the vehicle where narcotics might be found when the suspect is informed that the object of the search is for narcotics. Therefore, because the Defendant was not informed of the express object of the officers' search, the reasoning of the *Jimeno* Court is inapplicable.

The holding of *Jimeno* is also inapplicable in this case because of a caveat which the Court carved out in its opinion. The Court expressly distinguished the facts before it from a case where consent is given to search a trunk and a locked briefcase is located therein. The Court agreed with the Supreme Court of Florida that a consent to search a vehicle's trunk does not include authorization to pry open a locked briefcase located therein. *Jimeno*, —— U.S. at ——, 111 S.Ct. at 1804; *see State v. Wells*, 539 So.2d 464 (1989). As the Supreme Court noted: "[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag." *Id.; see also United States v. Springs*, 936 F.2d 1330, 1334 (D.C.Cir.1991). Therefore, under a narrow reading of *Jimeno*, a general consent to search a vehicle for narcotics

---

5. Although the Defendant was not expressly told what the search was for, he was apparently questioned about the presence of drugs, weapons or large amounts of cash. The following testimony was given by Officer Erni on Redirect:

Q: Do you recall when you discussed the consent to search with Mr. Reeves whether you indicated you were looking for specific items or not?

A: We did ask him if there was any weapons, narcotics, large amounts of currency in the vehicle, and he stated, no, there was not.

The court finds that a general inquiry such as that posed by Officer Erni is insufficient under *Jimeno* to reasonably define the express object of a search.

authorizes the search of any container that might contain narcotics except locked briefcases located in the trunk area. Consequently, *Jimeno* does not validate the search in this case.

In *United States v. Gutierrez–Mederos*, 965 F.2d 800 (9th Cir.1992), the Ninth Circuit addressed an issue similar to the one faced by the Supreme Court in *Jimeno*. There, Gutierrez–Mederos was pulled over by an Oregon State Patrol trooper for a traffic violation. The trooper asked the occupants if they had any drugs or weapons in the car. Each responded in the negative. The trooper then asked if he could search the car. Gutierrez–Mederos responded, "Yeah, go ahead. I have no problem with it." The trooper went to the hatchback section of the vehicle and used Gutierrez–Mederos's keys to open a side panel compartment inside the hatchback area. After removing a cardboard panel inside the compartment, the trooper discovered narcotics. On appeal, Gutierrez–Mederos argued that the trooper exceeded the scope of his consent by opening a locked container and moving the cardboard inside. *Id.* at 803.

The focus of inquiry in *Gutierrez–Mederos* was the same as the focus in *Jimeno*. The court emphasized that a general consent to search a vehicle only authorizes the search of a specific container if a *reasonable person* would believe that the consent authorized the search of that container. In addition, the court assessed the manner in which the trooper gained access to the container, focusing on the fact that the trooper did not pry open or break into the side panel, but instead used a key. The court also noted that the trooper did not force the cardboard divider apart, but rather pulled it back. *Id.* at 804. Citing *Jimeno*, the court held that the general consent to search given by Gutierrez–Mederos authorized the trooper to search any container within the car that could reasonably contain contraband. *Id.* at 803–04. The court concluded: "Because a reasonable person would believe that [Gutierrez–Mederos] had authorized these actions, the search was permissible." *Id.* (*citing Jimeno*, —— U.S. at ——, 111 S.Ct. at 1803–04).

*Gutierrez–Mederos* does not dictate the holding of the case before this court because it is factually distinguishable. First, the court in *Gutierrez–Mederos* noted that the trooper there did not break into the locked side panel, but instead he used a key. In the case at bar, Officer Erni did break into the briefcase insofar as he "picked" its combination lock. In addition, the container searched in *Gutierrez–Mederos* was an actual compartment of the vehicle, much like a glove box or a trunk, whereas the container searched here was a separate and distinct container that was connected to the vehicle only insofar as it was temporarily stored therein.

The most significant distinction between *Gutierrez–Mederos* and the case at bar, and the feature that compels this court to rule differently than the court in *Gutierrez–Mederos*, is that the item searched here was a locked briefcase, not a locked side-panel compartment. The court in *Gutierrez–Mederos* did not decide whether the scope of a general consent to search a vehicle is broad enough to authorize the search of a locked briefcase located in the vehicle's trunk. Rather, it only held that a general consent to search for weapons and narcotics in a vehicle authorizes a search of the vehicle's locked side panels. In fact, when viewed in light of *Jimeno*, *Gutierrez–Mederos* must be read as implicitly distinguishing locked side panels from locked briefcases. By making such a distinction, *Gutierrez–Mederos*'s holding cannot be said to conflict with the Supreme Court's statement in *Jimeno* that it would likely be *unreasonable* to conclude that a general consent would authorize a search of a locked briefcase. *See Jimeno*, —— U.S. at ——, 111 S.Ct. at 1804. Therefore, by holding that the Defendant's general consent to search the hatchback section of his vehicle could not have been reasonably interpreted as authorizing a search of the locked briefcase located therein, this court honors the holdings of both *Jimeno* and *Gutierrez–Mederos*.

### D. Express Consent to Search of Briefcase

The warrantless search of the briefcase located in the hatchback section of the De-

fendant's vehicle did not violate the Fourth Amendment if the Defendant specifically consented to its search.

■■■ The existence of consent to search is never to be lightly inferred. *United States v. Patacchia,* 602 F.2d 218, 219 (9th Cir.1979). Valid consent must be unequivocal and specific, and must be freely and intelligently given. *United States v. Shaibu,* 920 F.2d 1423, 1426 (9th Cir.1990). "The government always bears the burden of proof to establish the existence of effective consent." *Id.*

■■■ Both Officer Erni and Trooper Ladines testified on the issue of whether the Defendant specifically consented to a search of the briefcase. Officer Erni testified to the following: "We asked [the Defendant] if it would be okay if we looked inside of [the briefcase]. He didn't seem to mind if we did. He didn't say, no, I don't want you to look in there." Trooper Ladines testified that "we asked him whose briefcase it was, and then I believe we said can we look inside it, and he said, no—I'm sorry—he said go ahead."

The fact that the Defendant did not respond to the request for consent has little, if any, bearing on whether consent was actually given. As for Trooper Ladines's testimony, it is not only inconsistent with Officer Erni's, it indicates a certain amount of indecisiveness on behalf of Trooper Ladines, which reduces the credibility of his testimony on the subject. As this was the only evidence presented on the issue, the court concludes that the Government has failed to meet its burden in establishing that the Defendant specifically gave his oral consent to a search of the briefcase at the time it was discovered.

E. Scope of the Written Consent

As stated previously, it is undisputed that the Defendant signed a consent to search form. Further, the court has held that this consent was validly given. The remaining issue, therefore, is whether the scope of the written consent permitted the officers to search the briefcase.

■■■ The language of a written consent generally governs the scope of a search.

*See United States v. Kapperman,* 764 F.2d 786, 794–95 (11th Cir.1985); *United States v. Covello,* 657 F.2d 151, 154–55 (7th Cir. 1981). Further, it has been held that the test for examining the validity of evidence obtained through a consensual search requires an examination of the totality of the circumstances to construe the extent of the consent. *Covello,* 657 F.2d at 154; *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

■■■ The consent form that the Defendant signed was not for a vehicle; rather, it was for a premises. The form provided:

**LP: WA**

**KJH684**

*CONSENT TO SEARCH PREMISES*

I have been informed of my constitutional right not to have a search made of the premises hereinafter specified without a search warrant.

I have also been informed of my right to refuse to consent to the premises being searched without a search warrant.

I have been warned that anything discovered during such a search may be used against me in court, or in any immigration or administrative proceeding.

I hereby authorize Immigration Officer(s) **Erni, Paul K** and **Ladines WSP** to conduct a complete search of my premises located at **Argonne** and to take therefrom any letters, papers, materials, or other property which they may desire.

I have given this authorization to the above-named officer(s) voluntarily and without threats, promises, pressures, or coercion of any kind.

 x [signed] Rasah Reeves
 Signature

Date and hour: **11/11/91 9:30 a** Place:

---

* * Words in bold type were handwritten in the original consent form.

Two issues must be addressed in order to determine whether the written consent authorized search of the briefcase. First, it must be determined whether the consent form, which was for a premises, authorized

the search of the Defendant's vehicle. If it did, the court would then determine whether the language in the consent form was broad enough so as to justify the search of the locked briefcase in the trunk of the Defendant's vehicle.

The word "premises" used in the context of the preprinted consent form clearly referred to a structure, not a vehicle. This is consistent with the ordinary meaning of the word. However, according to Officer Erni, the Defendant was made aware that the consent he was signing was for his vehicle, not his residence. Officer Erni accomplished this by placing the Defendant's vehicle license number on the upper left-hand corner of the form, as well as specifying that the place searched was located at "Argonne," the street on which the Defendant was stopped.[6] Officer Erni testified that he did this in order to clarify the area which the officers were interested in searching. Further, when asked during the hearing if it was made clear to the Defendant that the form was a consent to search his vehicle, Officer Erni responded: "Yes, and again, I pointed out on the form, I wrote down the license plate number of the vehicle identified as the article that we were requesting permission to search."

The consent to search form itself is not a model of clarity. However, the modifications to the consent form and Officer Erni's testimony that he made it clear to the Defendant that the form was for a search of his vehicle, taken together with the fact that the Defendant was pulled over after extended travel on an Interstate and that he was nowhere near his residence, compels this court to conclude that the Defendant knew he was consenting to a search of his vehicle. Based on the preceding, the court cannot find that the Defendant was misled into thinking that he was signing a consent to search his residence, for it was objectively clear that his vehicle was the object of the search.

The remaining issue is whether by signing the consent form, the Defendant was consenting to a search of the locked briefcase. The Seventh Circuit addressed this issue in a case with very similar facts.

In *United States v. Covello*, 657 F.2d 151 (7th Cir.1981), the defendant signed a printed consent form which read in material part:

I, Michael T. Karalis, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize [law enforcement officials], to conduct a complete search of my automobile [*] located at garage behind residence, 2704 N. 74th Ct., Elmwood Park, Ill. These agents are authorized by me to take from my premises any letters, materials or other property which they may desire.

[*] Automobile described as a 1978, 4–dr. cooper-colored, cadillac, bearing Ill. (1979) lic. No. TX 1684.

*Id.* at 153. When the trunk of Karalis's vehicle was opened, the officers found three pieces of luggage. The luggage was opened and incriminating evidence was found. The district court suppressed the evidence found in the luggage, stating that the government failed to establish that Karalis expressly consented to the search of the luggage. The court found that Karalis only consented to the search of his automobile. *Id.* at 154. In reversing the district court, the Seventh Circuit stated that the interpretation of the signed consent form was crucial to the case.

The form authorized the agents "to conduct a *complete* search" of the car. The district court would read "complete" to mean "incomplete." Furthermore, those agents were authorized "to take from [the] premises any letters, materials or other property which they may desire." In the absence of the word "complete," one might possibly construe the consent in a limited fashion, however, the addition of the word "complete" indicates that consent was extended to everything

---

**6.** The Defendant's address, as listed in Trooper Ladines's report, was: South 1010 Eastern Road, Spokane, Washington, which is several miles from the intersection of Argonne and I–90.

within the automobile. Such a construction is further supported by the permission given to the agents to remove items from the automobile. "Letters" and "papers" would not be expected to be lying around loose. They would be contained in something.

*Id.* at 154. (Emphasis in original.)

A similar issue was addressed by the Eleventh Circuit in *United States v. Kapperman,* 764 F.2d 786 (11th Cir.1985). There, police pulled over a car driven by Cerventes and also occupied by Kapperman. The police obtained a written consent to search from Cerventes. They subsequently searched the vehicle and discovered an unlocked suitcase in the trunk. A search of the suitcase revealed cocaine. Kapperman argued on appeal that Cerventes's consent to search the vehicle did not authorize the police to open discrete containers found therein.

The court examined the consent to search form and found that it authorized the police to search the defendant's car and to remove "whatever documents or items of property whatsoever, which they deem pertinent to the investigation...." *Id.* at 794. The court held that this language was consistent with permitting the police to search the unlocked suitcase, as documents or other items could not be expected to be lying loose in the vehicle. *Id.* (*citing Covello,* 657 F.2d at 154). Although the search form in *Kapperman* did not contain the phrase "complete search" like *Covello,* the court nevertheless found that the written consent to search the automobile authorized the search of the unlocked suitcase located in the vehicle's trunk.

This court is persuaded by the reasoning contained in *Covello* and *Kapperman.* Like the defendants in those cases, the Defendant here signed a written consent form which authorized the officers to search his vehicle. Although it did not specifically state that the Defendant was consenting to a search of the locked briefcase, it did provide for a "complete search" of the premises, which the court determines was intended by the Defendant and the officers to mean a complete search of

the Defendant's vehicle. Like the court in *Covello,* this court finds that the presence of the word "complete" in the consent form indicates that consent was extended to *everything* in the automobile. Further, like the consent form in *Covello,* the form the Defendant signed here allowed the officers to take any letters, papers, materials, or other property which they desired. Although it is plausible that "papers" or "letters" would be lying loosely in the Defendant's vehicle, it is much more reasonable to conclude that they would be found in some sort of container. Moreover, by allowing the officers the freedom to take essentially any "property" located in his vehicle, it would be unreasonable to conclude that the Defendant did not consent to the search of the briefcase.

Based on the foregoing, the court finds that the written consent to search form knowingly and voluntarily signed by the Defendant authorized the officers to search the locked briefcase that was located in the hatchback section of the Defendant's vehicle.

## CONCLUSION

In sum, the court finds that the arrest of the Defendant was valid and not a mere pretext to a search. The court also finds that the Defendant did have a reasonable expectation of privacy in the locked briefcase, enabling him to challenge its warrantless search. Further, the court finds that the Defendant's oral and written consent to search was voluntarily given. His oral consent to search the hatchback section of his vehicle did not authorize the search of the briefcase. However, the written consent form the Defendant signed did authorize the séarch. Consequently, because the arrest and subsequent search of the Defendant's property did not violate the Fourth Amendment, the Defendant's motion to suppress must be denied.

IT IS HEREBY ORDERED:

1. The Defendant's Motion and Memorandum to Suppress Evidence (Ct. Rec. 21) IS DENIED.

2. Pursuant to 18 U.S.C. § 3161(h)(1)(F), the period from May 27, 1992, when Defen-

dant's motion was filed, until July 9, 1992, when it was resolved, is HEREBY DE-CLARED EXCLUDABLE for purposes of computing time under the Speedy Trial Act.

IT IS SO ORDERED. The Clerk is hereby directed to enter this Order and furnish copies to counsel.